## UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | § Chapter 11 |
| | § |
| MPF HOLDING US LLC, *et al.* | § Case No. 08-36084 |
| | § |
| Debtors. | § Jointly Administered |

## AMENDED DISCLOSURE STATEMENT FOR THE DEBTORS' PROPOSED AMENDED JOINT PLAN OF REORGANIZATION

### (as modified)

### IMPORTANT DATES

- Date by which Ballots must be received: **June 4**, **2010**

- Deadline by which objections to Confirmation of the Plan and to final approval of the Disclosure Statement must be Filed and served: **June 4**, **2010**

- Hearing on Confirmation of the Plan: 9:00 a.m., prevailing Central Time, **June 9**, **2010**

Harry A. Perrin, SBT #15796800
D. Bobbitt Noel, Jr., SBT #15056500
Courtney S. Lauer, SBT # 24043771
John C. Ivascu, SBT #24067680
Ginny A. Maslin, SBT #24055918
First City Tower
1001 Fannin, Suite 2500
Houston, TX 77002
Telephone: 713-758-2222
Facsimile: 713-758-2346

Attorneys for the Debtors and Debtors in Possession

Dated: June 8, 2010

US 208598v.14

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN DESCRIBED HEREIN IS JUNE 4, 2010, UNLESS THE DEBTORS EXTEND THIS DATE PRIOR TO THE PLAN VOTING DEADLINE. TO BE COUNTED, THE BALLOTING AGENT MUST RECEIVE YOUR BALLOT OR MASTER BALLOT ON OR BEFORE THE PLAN VOTING DEADLINE.

### PLEASE READ THIS IMPORTANT INFORMATION

THE BANKRUPTCY CODE REQUIRES THAT THE PARTY PROPOSING A CHAPTER 11 PLAN OF REORGANIZATION PREPARE AND FILE A DOCUMENT WITH THE BANKRUPTCY COURT CALLED A "DISCLOSURE STATEMENT." THIS DOCUMENT IS THE DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") FOR THE PLAN DESCRIBED HEREIN. THE DISCLOSURE STATEMENT INCLUDES CERTAIN EXHIBITS, EACH OF WHICH ARE INCORPORATED INTO AND MADE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

THE BANKRUPTCY COURT HAS APPROVED THIS DISCLOSURE STATEMENT ON A CONDITIONAL BASIS FOR THE PURPOSE OF SENDING TO YOU TO SOLICIT YOUR VOTE TO ACCEPT THE PLAN. A COPY OF THE ORDER CONDITIONALLY APPROVING THE DISCLOSURE STATEMENT IS ATTACHED HERETO AS EXHIBIT "A."

ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT AND THE PLAN ATTACHED HERETO, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

THE STATEMENTS AND OTHER INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT WERE MADE AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DATE SET FORTH ON THE COVER PAGE HEREOF. HOLDERS OF CLAIMS AND INTERESTS MUST RELY ON THEIR OWN EVALUATION OF DEBTORS AND THE LIQUIDATING DEBTORS AND THEIR OWN ANALYSIS OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO ACCEPT OR REJECT THE PLAN.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT SOLELY FOR PURPOSES OF SOLICITING HOLDERS OF CLAIMS AND INTERESTS TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PERSON FOR ANY OTHER PURPOSE. THE CONTENTS OF THIS DISCLOSURE STATEMENT SHALL NOT BE DEEMED AS PROVIDING ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY SUCH LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT AND THE PLAN. MOREOVER, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.

THE DEBTORS HAVE NOT AUTHORIZED ANY PARTY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OR THE LIQUIDATING DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT RELY UPON ANY OTHER INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN ACCEPTANCE OR REJECTION OF THE PLAN.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN, CERTAIN OTHER DOCUMENTS, AND CERTAIN FINANCIAL INFORMATION. THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE. IN THE EVENT OF ANY

US 208598v.14

INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR THE OTHER DOCUMENTS OR FINANCIAL INFORMATION INCORPORATED HEREIN BY REFERENCE, THE PLAN, OR SUCH OTHER DOCUMENTS, AS APPLICABLE, SHALL GOVERN FOR ALL PURPOSES.

THE BANKRUPTCY COURT HAS SCHEDULED THE FINAL HEARING ON APPROVAL OF THE DISCLOSURE STATEMENT AND THE CONFIRMATION HEARING TO COMMENCE ON JUNE 9, 2010, AT 9:00 A.M. PREVAILING CENTRAL TIME BEFORE THE HONORABLE JEFF BOHM, UNITED STATES BANKRUPTCY JUDGE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION, 515 RUSK STREET, HOUSTON, TEXAS 77002.  THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE BANKRUPTCY COURT WITHOUT FURTHER NOTICE EXCEPT FOR AN ANNOUNCEMENT OF THE ADJOURNED DATE MADE AT THE CONFIRMATION HEARING OR ANY ADJOURNMENT OF THE CONFIRMATION HEARING.

TO BE COUNTED, THE BALLOT OR MASTER BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED NO LATER THAN JUNE 4, 2010.

OBJECTIONS TO CONFIRMATION OF THE PLAN AND TO FINAL APPROVAL OF THE DISCLOSURE STATEMENT MUST BE FILED AND SERVED ON OR BEFORE JUNE 4, 2010. UNLESS OBJECTIONS TO CONFIRMATION OR TO FINAL APPROVAL OF THE DISCLOSURE STATEMENT ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE ORDER APPROVING THE DISCLOSURE STATEMENT, THEY MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

US 208598v.14

# TABLE OF EXHIBITS

| Exhibit | Name |
|---|---|
| A | Amended Order Approving Debtors' Emergency Motion for an Order (I) Conditionally Approving the Disclosure Statement; (II) Consolidating the Hearing on Final Approval of the Disclosure Statement and Confirmation of the Plan and Setting Hearing; (III) Approving Ballots and Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Debtors' Joint Plan of Reorganization; (IV) Approving Non-Voting Notice Procedures; and (V) Setting Related Deadline (Dkt. No. 368) |
| B | Debtors' Amended Joint Plan of Reorganization (as modified) |
| C | Orders Appointing Joint Provisional Liquidators |

US 208598v.14

# ARTICLE I

## DEFINED TERMS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME

**Section 1.01      Scope of Defined Terms; Rules of Construction**

For purposes of this Disclosure Statement, except as expressly defined elsewhere in the Disclosure Statement or unless the context otherwise requires, all capitalized terms used herein shall have the meanings ascribed to them in Article I of the Plan.  Any term used but not defined herein that is defined in the Bankruptcy Code or the Bankruptcy Rules, as the case may be, shall have the meaning ascribed in the Bankruptcy Code or the Bankruptcy Rules.  Whenever the context requires, such terms shall include the plural as well as the singular.  The masculine gender shall include the feminine, and the feminine gender shall include the masculine.

**Section 1.02      Computation of Time**

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

# ARTICLE II

# BACKGROUND

**Section 2.01      Introduction**

MPF Holding US LLC, a Texas limited liability company, MPF Corp. Ltd., a business entity incorporated under the laws of Bermuda, and MPF-01 Ltd., a business entity incorporated under the laws of Bermuda, debtors and debtors in possession (the "Debtors") in the above-captioned jointly administered Chapter 11 Cases pending in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court") submit the following Disclosure Statement pursuant to Bankruptcy Code section 1125 for the purpose of soliciting votes to accept or reject the Debtors' Plan.  A copy of the Plan is attached hereto as **Exhibit "B"**.  The Disclosure Statement describes certain aspects of the Plan, including the treatment of holders of Claims and Interests, and also describes certain aspects of the Debtors' operations, financial information, and other related matters.  The Disclosure Statement also describes certain potential United States federal income tax consequences to such holders, voting procedures and the confirmation process.

On the Petition Date, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.  By order of the Bankruptcy Court, the Chapter 11 Cases are being jointly administered.  Pursuant to Bankruptcy Code §§ 1107 and 1108, the Debtors are continuing to operate their businesses and manage their properties as debtors in possession in these Chapter 11 cases.

1

**Section 2.02          Sources of Information**

**THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECTED TO A CERTIFIED AUDIT AND IS BASED, IN PART, UPON INFORMATION PREPARED BY PARTIES OTHER THAN THE DEBTORS. THEREFORE, ALTHOUGH THE DEBTORS HAVE MADE EVERY REASONABLE EFFORT TO BE ACCURATE IN ALL MATERIAL MATTERS, THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT ALL THE INFORMATION CONTAINED HEREIN IS COMPLETELY ACCURATE.**

Except as otherwise expressly indicated, the portions of this Disclosure Statement describing the Debtors, their businesses, properties and management, and the Plan, have been prepared from information furnished by the Debtors.

Certain of the materials contained in this Disclosure Statement are taken directly from other readily accessible documents or are digests of other documents. While the Debtors have made every effort to retain the meaning of such other documents or portions that have been summarized, the Debtors urge that any reliance on the contents of such other documents should depend on a thorough review of the documents themselves. In the event of a discrepancy between this Disclosure Statement and the actual terms of a document, the actual terms of such document shall apply.

No statements concerning the Debtors, the value of their property, or the value of any benefit offered to the Holder of a Claim or Interest in connection with the Plan should be relied upon other than as set forth in this Disclosure Statement. In arriving at your decision, you should not rely on any representation or inducement made to secure your acceptance or rejection that is contrary to information contained in this Disclosure Statement, and any such additional representations or inducements should be reported to counsel for the Debtors, Vinson & Elkins L.L.P., Attn:  Courtney S. Lauer, First City Tower, 1001 Fannin Street, Suite 2500, Houston, Texas 77002-6760.

**Section 2.03          Description of Debtors' Business and Assets**

The Debtors were formed for the purpose of constructing, owning, and operating mobile offshore units that serve as oil drilling vessels used for floating production, storage, and offloading functions ("Multi Purpose Floaters").  The Debtors' assets consist primarily of various supply and construction contracts for the construction and delivery of a Multi Purpose Floater and any related equipment that may have been delivered pursuant to those contracts.  The Debtors, through MPF, also hold a license with Oceania AS to build up to four Multi Purpose Floaters.

**Section 2.04          Debtors' Corporate Structure and Pre-Petition Indebtedness**

MPF US is a Texas limited liability company with its principal executive offices in Houston, Texas.  MPF US is wholly-owned by MPF, a Bermuda limited liability company, and was formed to own an 80% interest in MPF Operating Company LLC ("OPCO"), a Texas limited liability company headquartered in Houston, Texas but not a debtor in these Chapter 11 Cases.  In addition to its 100% ownership of MPF US, MPF also owns 100% of MPF-01, a

Bermuda limited liability company and a debtor in these Chapter 11 Cases. MPF-01 was incorporated on October 3, 2007, and currently holds the hull construction contract with Cosco Dalian Shipyard Co. Ltd. for the first Multi Purpose Floater. MPF holds the Oceania AS license and all other services and supply contracts relating to the construction of the Multi Purpose Floater.

MPF Corp. (Norway) AS ("MPF Norway"), a Norwegian entity and wholly owned subsidiary of MPF Corp., and OPCO provided a wide range of management services to the MPF group prior to the Petition Date. MPF-01 Pte, Ltd. ("MPF Singapore"), a Singaporean entity and wholly owned by MPF Corp., held the drilling services contract with Petrobras Oil & Gas B.V. OPCO, MPF Norway, and MPF Singapore are not debtors in these Chapter 11 Cases, and each has either commenced or completed winding up processes in the various jurisdictions in which they were incorporated.

Prior to the Petition Date, the shares of MPF were publicly traded on the OTC-list of the Norwegian Securities Dealers Association.

*The First Lien Credit Agreement*

MPF and MPF-01 are parties to that certain Facility Agreement dated as of November 21, 2007 among MPF and MPF-01, the financial institutions party thereto, and DvB as lead arranger and facility agent and a lender (as amended, supplemented, or otherwise modified from time to time) (the "First Lien Credit Agreement"), pursuant to which the Lenders from time to time thereto made loans to MPF and MPF-01 secured by various security interests which together constitute a first priority lien on substantially all of the assets of MPF and MPF-01.

Pursuant to certain agreements among the Lenders in connection with the First Lien Credit Agreement, the advances (including certain postpetition advances) were made pursuant to various tranches that are entitled to certain priorities of payment as among the Lenders. These tranches and the amounts outstanding thereunder through and including June 23, 2010, the day before the anticipated Closing Date of June 24, 2010, are identified in the table below in the order of priority of payment as set forth in the First Lien Credit Agreement and related documents.

| Tranche | Principal Amount Advanced | Postpetition or Prepetition Advance | Part of DvB Secured Claim (Yes/No) | Part of DIP Loan Claims (Yes/No) | Amount Outstanding including interest and redemption fees as of 6/23/10 |
|---|---|---|---|---|---|
| **Tranche B2** | $63,500,000 | Prepetition | Yes | No | $85,338,009[1] |
| **Tranche B1B** | $2,500,000 | Postpetition | No | Yes | $3,551,116[2] |
| **Tranche B2B** | $5,500,000 | Postpetition | No | Yes | $7,538,265[3] |
| **Tranche B1B** | $9,500,000 | Prepetition | No | No | $12,367,123 |
| **Tranche B1A** | $9,500,000 | Prepetition | No | No | $13,262,270 |
| **Tranche B1A** | $90,000,000 | Prepetition | No | No | $125,642,553 |

Given that the value of the Acquired Assets and Other Assets is less than the aggregate amount of the DIP Loan Claims and the DvB Secured Claim, which are entitled to priority in payment vis-à-vis the Prepetition Tranche B1B and B1A Claims, such Prepetition Tranche B1B and B1A Claims are unsecured Claims that shall be classified, for purposes of distributions pursuant to and treatment under the Plan, as General Unsecured Claims.

*2006 Bond Debt*

In September 2006, the Debtor raised $150 million through a bond issuance pursuant to that certain Loan Agreement between MPF as Borrower and the Bond Trustee on behalf of the Bondholders in bond issue FRN MPF Corp Ltd Secured Bond Issue 2006/2011 with Call Option

---

[1] This amount reflects the application of $1,202,387.96 from a DvB suspense account, which application was authorized by the *Stipulation and Agreed Order Between MPF Corp. Ltd., MPF-01 Ltd. and DvB Group Merchant Bank (Asia) Ltd.* (Dkt. No. 123) dated December 17, 2008. An additional $6,570,555.02 was applied to various amounts due and owing under the First Lien Credit Agreement. The Tranche B2 amount also reflects application of $877,105.85 from the DvB proceeds account. An additional $202,883.90 was applied from the DvB proceeds account to various amounts due and owing under the First Lien Credit Agreement.

[2] This amount includes a $500,000.00 redemption fee payable in connection with the repayment of the Tranche B1B postpetition advances.

[3] This amount includes a $1,100,000.00 redemption fee payable in connection with the repayment of the Tranche B2B advances.

("2006 Bond Debt").  Although the 2006 Bond Debt was secured by second priority liens as of the Petition Date on certain of the assets of MPF and MPF-01, the value of the Acquired Assets and Other Assets is less than the aggregate amount of the DIP Loan Claims and the DvB Secured Claim, and, therefore, any and all 2006 Bond Debt Claims are unsecured Claims that shall be classified, for purposes of distributions pursuant to and treatment under the Plan, as General Unsecured Claims.

### 2008 Unsecured Convertible Bond Debt

In April and May 2008, MPF raised an additional $75 million pursuant to that certain Loan Agreement between MPF as Borrower and the Bond Trustee on behalf of the Bondholders in the bond issue 10.0 per cent MPF Corp. Ltd. Unsecured Convertible Bond Issue 2008/2013 ("2008 Unsecured Convertible Bond Debt").  The 2008 Bond Debt Claims shall be classified, for purposes of distributions pursuant to and treatment under the Plan, as General Unsecured Claims.

### Trade Debt

The Debtors estimate that they had outstanding accounts payable due to vendors and suppliers of approximately $82 million as of the Petition Date.

### Section 2.05        Post-Petition Indebtedness

As noted in Section 2.04 above, the Debtors received net postpetition advances of $8,000,000.00 under the First Lien Credit Agreement that were authorized by the Bankruptcy Court and received by the Debtors on a secured basis.

In addition, DvB provided debtor in possession financing to MPF and MPF-01 pursuant to the DIP Loan Agreement as approved by the Bankruptcy Court pursuant to orders entered on September 23, 2009, January 7, 2010, and April 14, 2010.  The Debtors' obligations to DvB under the DIP Loan Agreement are secured by (a) perfected first priority and priming liens on substantially all of the assets of MPF and MPF-01 other than (i) Avoidance Actions and (ii) any liens held by vendors ("Vendor Liens") or mechanics or materialmen ("M&M Liens") that were valid, perfected and unavoidable liens in existence on the Petition Date or any other such liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code; and (b) perfected junior and second priority liens on substantially all of the assets of MPF and MPF-01 that are subject to the Vendor Liens and M&M Liens.  DvB was also granted a superpriority administrative expense claim pursuant to Bankruptcy Code § 364(c)(1) against each of the Debtors.

The current total Commitment under the DIP Loan Agreement is $7,000,000.00.  As of the filing of the Disclosure Statement and the Plan, the Debtors have received $4,750,000.00 in advances under the DIP Loan Agreement.  It is anticipated that the Debtors will fully draw the facility by the Confirmation Date.  The Debtors currently estimate that the total due and outstanding as of the anticipated Closing Date will be $8,793,298.00, inclusive of principal, interest, and redemption fees.

**Section 2.06          Events Precipitating the Reorganization Cases**

In April and early May 2008, the Debtors' estimate of the full cost to complete the Multi Purpose Floater project was $866 million. In late May 2008, it was decided to move the contract for the integration of the various parts and completion of the vessel from Spain to Singapore, and a detailed cost review was initiated which ultimately indicated that the earlier estimate was incorrect and that a more realistic estimate was substantially in excess of $1.0 billion. The Debtors immediately began a refinancing and sale process with the close support of the major stakeholders. During this period, MPF failed to meet certain financial covenants that would allow it to make further draws on the First Lien Credit Agreement. Subsequently, DvB allowed some draw downs based upon waivers, and limited funds were made available by a group of investors made up of existing lenders, bondholders, and shareholders through DvB on an ad hoc basis.

On August 5, 2008, DvB indicated to the Debtors that it was unwilling to grant further waivers under the First Lien Credit Agreement to keep the Multi Purpose Floater project going. Between August 5, 2008 and August 29, 2008, when all funding ceased, funding for the project was made on an ad hoc basis through the First Lien Credit Agreement by a consortium of investors in that facility.

As a result of the cessation of funding, the Debtors were not able to meet their obligations under the various construction contracts without securing further financing. On September 24, 2008, MPF and MPF-01, which are incorporated in Bermuda (the "Bermuda Debtors") commenced proceedings in the Supreme Court of Bermuda known under Bermuda Law as "winding up" proceedings (the "Bermuda Proceedings"). At the same time, the Bermuda Debtors issued a summons seeking the appointment of Joint Provisional Liquidators. On September 24, 2008, the Supreme Court of Bermuda entered orders appointing the Joint Provisional Liquidators over the Bermuda Debtors (the "Joint Provisional Liquidation Orders"). A copy of the orders appointing the Joint Provisional Liquidators over MPF and MPF-01 are attached hereto as **Exhibit "C."**

The Joint Provisional Liquidators were and are specifically empowered by the Supreme Court of Bermuda to oversee and liaise with the existing Boards of Directors of the Bermuda Debtors in determining the most appropriate manner of effecting a reorganization and/or refinancing of the Bermuda Debtors in conjunction with proceedings commenced under chapter 11 of the Bankruptcy Code.

On September 24, 2008, MPF and MPF US, and on September 25, 2008, MPF-01 each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing these Chapter 11 Cases.

**Section 2.07          Debtors' Management**

Pursuant to the Joint Provisional Liquidation orders, Debtors' Board and management has remained in place to manage the affairs of the Bermuda Debtors, subject to the oversight and reporting functions exercised by the Joint Provisional Liquidators with respect to the Bermuda Proceedings. Debtors' management consists of the following Persons:

**Richard Petrie,** Interim Chief Executive Officer of MPF and authorized signatory of MPF US and MPF-01.

**Gerard Donald**, Interim Chief Financial Officer of MPF and authorized signatory of MPF US and MPF-01.

**Hans Petter Finne**, Chairman of the Board of Directors of MPF.

**Mark Russell**, Director, Board of Directors of MPF.

It is noted that the Joint Provisional Liquidators were given authority in the Bermuda Order, among other things, to set up and maintain bank accounts and to borrow and receive funds for the purpose of paying the fees and expenses of the Bermuda Proceedings and the Chapter 11 Cases. Pursuant to this authority, the Joint Provisional Liquidators established and have been funding the Bermuda Proceedings and these Chapter 11 Cases out of the Liquidation Account. The Bermuda Orders also provide that MPF and MPF-01 must consult with the Joint Provisional Liquidators prior to the sale of substantially all of the business or assets of MPF or MPF-01 or the incurrence of any debt, which management has done in each instance.

## Section 2.08    Overview of Chapter 11

Commencing a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The principal objective of a chapter 11 case is to consummate a plan, which sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan by a bankruptcy court binds a debtor, any person acquiring property under the plan, any creditor or equity interest holder of a debtor, and any other person or entity the bankruptcy court may find to be bound by such plan. Chapter 11 requires that a plan treat similarly situated creditors and similarly situated equity interest holders equally, subject to the priority provisions of the Bankruptcy Code.

Prior to soliciting acceptances of a proposed plan, Bankruptcy Code § 1125 requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan of reorganization. This Disclosure Statement is submitted in accordance with Bankruptcy Code § 1125.

## Section 2.09    Administration of the Chapter 11 Cases

### (a)    First-day Motions

On the Petition Date, the Debtors filed numerous first-day motions, the object of which was to streamline the transition to operating under chapter 11. These first-day motions requested, among other things, (i) designation as a complex Chapter 11 Case; (ii) joint administration of the Chapter 11 Cases; (iii) an extension of time to file Schedules; and (iv) an

order confirming certain protections afforded by the Bankruptcy Code. The Bankruptcy Court has entered orders approving each of the foregoing motions.

### (b)    Retention of Professionals

The Debtors have filed several applications to retain professionals in these Cases. Specifically, the Debtors filed applications to employ and to retain (a) Vinson & Elkins L.L.P., as their general bankruptcy and restructuring counsel, (b) Okin Adams & Kilmer, LLP as their conflicts counsel, (c) Conyers Dill & Pearman, as Bermuda counsel for the Bermuda debtors, (d) Thommessen Krefting Greve Lund AS Advokatfirma[4] as their special Norwegian counsel, and (e) Fearnley Offshore AS and Clarkson Shipping Services USA, Inc., as their advisors.[5]

### (c)    Assumption of Executory Interim Executive Contracts

On October 14, 2008, the Debtors filed an amended motion seeking authorization to assume each of the following executive contracts: (i) that certain Consultancy Agreement, dated July 7, 2008, as amended, between Petrie and Partners Limited and MPF; (ii) that certain agreement for the provision of Services of an Interim Manager, dated July 21, 2008, between MPF and Penna Interim; and that certain Services Agreement, dated October 8, 2007, between MPF and Hans Petter Finne.   On October 16, 2008, the Bankruptcy Court approved the assumption of each of the above-mentioned executory contracts.

### (d)    Schedules

On November 7, 2008, each of the Debtors filed their Schedules.

### (e)    Preference Analysis and Other Potential Avoidance Actions

The Bankruptcy Code preserves the Debtors' rights to prosecute claims and causes of action which exist outside of bankruptcy, and also empowers the Debtors to prosecute certain claims which are established by the Bankruptcy Code, including claims to avoid and recover preferential transfers and fraudulent conveyances. As described in Section 5.03 below, the Plan preserves all of the Debtors' rights in respect of all Causes of Action and Avoidance Actions (other than Causes of Action and Avoidance Actions against any Released Party that are released under the Plan or against any other Person to the extent released, waived, or settled pursuant to prior orders of the Bankruptcy Court), transfers the Debtors' rights in respect of such Causes of Action (including Avoidance Actions) to the Litigation Trustee, and empowers the Litigation Trustee to prosecute, collect, and/or settle the Avoidance Actions as deemed appropriate.

---

[4] As of September 1, 2009, the legal name of Thommessen Krefting Greve Lund AS Advokatfirma was changed to Advokatfirmaet Thommessen AS.

[5] Pursuant to that certain Mandate Agreement dated October 9, 2008, as amended by that certain Addendum No. 1, dated June 16, 2009 (the "Mandate Agreement"), each between the Debtors and Fearnley Offshore AS ("Fearnley") and Clarkson Shipping Services USA, Inc. ("Clarkson" and, with Fearnley, the "Advisors"), the engagement of the Advisors terminated on December 1, 2009.

To date, neither the Debtors nor other parties have identified or fully investigated any potential Avoidance Actions.

**IN REVIEWING THIS DISCLOSURE STATEMENT AND THE PLAN, AND IN DETERMINING WHETHER TO VOTE IN FAVOR OF OR AGAINST THE PLAN, HOLDERS OF CLAIMS AND INTERESTS (INCLUDING PARTIES THAT RECEIVED PAYMENTS FROM THE DEBTORS WITHIN NINETY (90) DAYS PRIOR TO THE PETITION DATE AND ANY PARTY IDENTIFIED ON SCHEDULE 3(b) OR 3(c) OF THE DEBTORS' STATEMENTS OF FINANCIAL AFFAIRS) SHOULD CONSIDER THAT A CAUSE OF ACTION MAY EXIST AGAINST THEM, THAT THE PLAN PRESERVES ALL CAUSES OF ACTION OTHER THAN THOSE RELEASED HEREUNDER OR BY PRIOR ORDER OF THE BANKRUPTCY COURT, AND THAT THE PLAN AUTHORIZES THE LITIGATION TRUSTEE TO PROSECUTE THE SAME.**

(f)    *Exclusivity*

The Debtors' exclusive right to file a plan in their bankruptcy cases expired on August 31, 2009 and the exclusive right to solicit acceptances expired on October 31, 2009.

**Section 2.10        Marketing of Debtors' Assets During the Chapter 11 Cases**

Shortly after the Petition Date, the Debtors filed motions with the Bankruptcy Court to establish bidding procedures in connection with the sale of the Debtors' assets. These procedures were approved, and the Debtors and their advisors aggressively marketed the Debtors' assets on a worldwide basis. Potential buyers contacted during the process included international offshore drilling, floating production and general main contractors, oil companies, shipyards, vendors and suppliers, investors and financial institutions. As set forth in the Status Report filed on January 9, 2009, more than 450 companies from all areas of the world were contacted by the Debtors' advisors. Ultimately, more than 25 companies signed a nondisclosure agreement with the Debtors in order to conduct due diligence with respect to the MPF assets. Although five companies submitted bids in early December 2008, none of the bids were conforming bids. MPF worked diligently with the bidders to establish a firm understanding of each bid and to attempt to advance the negotiations to the point of agreeing on the terms of a sale of the assets. However, the efforts by the Debtors and their advisors, in an environment where oil and natural gas prices had plummeted since the Petition Date and in the midst of a global credit crisis, proved unsuccessful.

Over the remaining part of 2009, the Debtors and DvB continued to market the Debtors' assets and to try to bring new potential buyers to the table. Through the efforts primarily of DvB, but with the assistance of the Debtors' management and project team, the Debtors have now achieved an agreement for the sale and purchase of the Acquired Assets with Cosco, MPF's largest vendor. The Debtors understand that Cosco intends to use the Acquired Assets in connection with the construction of a fully commissioned drillship under a turn-key engineering, procurement, and construction contract ("EPC Contract") between Cosco and a third party (the "Drillship Purchaser") who will take delivery of the drillship upon completion of construction.

To perform its obligations under the EPC Contract, the Drillship Purchaser may seek debt financing from one or more financial institutions, including DvB.

The essential terms of the Assignment and Purchase Agreement were finally agreed upon in early May, 2010 and form the basis of the Plan.

Because of the comprehensive and extensive (with respect to both time and geography) marketing efforts since the Petition Date, the Debtors are confident that all available options and avenues for concluding a timely sale of the Debtors' assets to a buyer other than the Purchaser and on better terms than those under the Assignment and Purchase Agreement have been explored and exhausted and that the Purchaser has emerged as the most credible buyer with the highest and best offer for the Debtors' assets.  With very limited debtor in possession funding available to the Debtors, time is of the essence in finalizing the sale of the Acquired Assets to the Purchaser.  The Debtors believe that the sale of the Acquired Assets to the Purchaser as contemplated in the Plan is in the best interests of the creditors.

## ARTICLE III

## UNCLASSIFIED CLAIMS
### (NOT ENTITLED TO VOTE ON THE PLAN)

In accordance with Bankruptcy Code § 1123(a)(1), Administrative Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III hereof.  These unclassified Claims are treated as follows:

**Section 3.01        Administrative Claims**

Except as otherwise provided for in the Plan, and subject to the requirements of Section 12.01 of the Plan, each Holder of an Allowed Administrative Claim shall, in full satisfaction, release, settlement, and satisfaction of such Allowed Administrative Claim, (a) to the extent such claim is due and owing on the Effective Date, be paid in full, in Cash, on the Effective Date or as soon as is reasonably practicable thereafter; (b) to the extent such claim is not due and owing on the Effective Date, be paid in full, in Cash, (i) as soon as is reasonably practicable after such claim becomes due and payable under applicable non-bankruptcy law or (ii) in the ordinary course of business; or (c) receive such other treatment as to which such Holder may agree with Liquidating MPF.  Cash payments of Allowed Administrative Claims shall be paid from the Liquidation Account.

As of the date hereof, the Debtors estimate that, as of the Effective Date, the total amount of Allowed Administrative Claims will be approximately $2,103,300.00. The Debtors further estimate that approximately $1,204,000.00 of the total amount of Allowed Administrative Claims will consist of unpaid Professional Fees, $300,000.00 will consist of unpaid Wind-down

Costs relating to the Bermuda Proceedings and the Chapter 11 cases, and approximately $599,300.00 will constitute unpaid ordinary course accounts payable.[6]

## Section 3.02        Priority Tax Claims

Each Holder of an Allowed Priority Tax Claim shall, in full satisfaction and release thereof, receive (i) such treatment as to which such Holder may agree with Liquidating MPF, subject to the consent of DvB, or (ii) payment in full of such Allowed Priority Tax Claim on the Effective Date or as soon as is reasonably practicable thereafter.  Cash payments of Allowed Priority Tax Claims shall be paid from the Liquidation Account.  The Debtors believe that the amount of Allowed Priority Tax Claims will be zero as of the Effective Date.

## Section 3.03        DIP Loan Claims

The DIP Loan Claims, whether arising under the First Lien Credit Agreement or the DIP Loan Agreement, shall, in full satisfaction, release, settlement, and discharge of such DIP Loan Claims, be paid in full, in Cash, on the Effective Date by the payment to DvB by the Purchaser of such portion of the Cash Proceeds necessary to pay the aggregate amount of the DIP Loan Claims.  The amount of DIP Loan Claims that will be due and owing as of June 23, 2010, the day before the anticipated Closing Date, is currently estimated to be $19,882,679.00.  DvB is the sole lender with respect to, and Holder of, the DIP Loan Claims.

## ARTICLE IV

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

## Section 4.01        Introduction

The categories of Claims and Interests set forth below classify Claims and Interests for all purposes, including for purposes of voting, Confirmation, distributions pursuant to the Plan and Bankruptcy Code §§ 1122 and 1123(a)(1). A Claim or Interest shall be deemed classified in a particular Class only to the extent that it qualifies within the description of such Class, and shall be deemed classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. Notwithstanding anything to the contrary in the Plan, a Claim or Interest shall be deemed classified in a Class only to the extent that such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.

All Claims (except for Administrative Claims and Priority Tax Claims, which are not classified pursuant to Bankruptcy Code section 1123(a)(1)) are classified in Section 4.03 below.

---

[6] The Debtors believe that under the terms of the Mandate Agreement with the Advisors, the Advisors are not entitled to a Success Fee (as defined in the Mandate Agreement).  Thus, the Debtors' estimate of Allowed Administrative Claims and the Plan do not contemplate payment of any such Success Fee.  The Debtors believe that the Advisors may disagree with this position.

**Section 4.02          Voting; Acceptance by Impaired Classes**

       *(a)          Acceptance By Impaired Classes*

       Each Impaired Class of Claims that will (or may) receive or retain property or any interest in property under the Plan shall be entitled to vote to accept or reject the Plan. An Impaired Class of Claims shall have accepted the Plan if (i) the Holders (other than any Holder designated under Bankruptcy Code section 1126(e)) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (ii) the Holders (other than any Holder designated under Bankruptcy Code section 1126(e)) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan. An Impaired Class of Interests shall have accepted the Plan if the Holders (other than any Holder designated under Bankruptcy Code section 1126(e)) of at least two-thirds in amount of the Allowed Interests actually voting in such Class have voted to accept the Plan.

       *(b)          Voting Presumptions*

       Claims and Interests in Unimpaired Classes are conclusively deemed to have accepted the Plan pursuant to Bankruptcy Code § 1126(f) and, therefore, are not entitled to vote to accept or reject the Plan.  Claims and Interests in Classes that do not entitle the Holders thereof to receive or retain any property under the Plan are conclusively deemed to have rejected the Plan pursuant to Bankruptcy Code § 1126(g) and, therefore, are not entitled to vote to accept or reject the Plan.

**Section 4.03          Claims Against the Debtors**

       Class 1:    Priority Non-Tax Claims

       <u>Classification</u>: Class 1 consists of the Allowed Priority Non-Tax Claims against the Debtors.

       <u>Treatment</u>: Except to the extent that a Holder of an Allowed Claim in Class 1 has agreed in writing with the Debtors to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 1 shall receive, on account of, and in full and complete settlement and release of and in exchange for, such Claim, at the election of the Debtors, (i) Cash equal to the amount of such Allowed Claim in Class 1 in accordance with Bankruptcy Code § 1129(a)(9), on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the date such Claim in Class 1 becomes an Allowed Claim in Class 1 (or as soon as reasonably practicable thereafter), or (ii) such other treatment agreed to by the Debtors required to render such Allowed Claim in Class 1 Unimpaired pursuant to Bankruptcy Code § 1124.  Cash payments of Allowed Claims in Class 1 shall be paid from the Liquidation Account.  The Debtors believe that there are no Priority Non-Tax Claims.

       <u>Voting</u>: Claims in Class 1 are Unimpaired.  Each Holder of an Allowed Claim in Class 1 shall be conclusively deemed to have accepted the Plan pursuant to Bankruptcy Code § 1126(f), and, therefore, shall not be entitled to vote to accept or reject the Plan.

Class 2:     DvB Secured Claim

Classification: Class 2 consists of the DvB Secured Claim against the Debtors.

Allowance: The DvB Secured Claim against the Debtors is Allowed under the Plan as a Secured Claim in Class 2 in the amount of $85,338,009.00.

Treatment: In full and complete settlement and release of and in exchange for such Allowed Class 2 Claim, on the Effective Date and as part of the Closing, DvB shall receive (i) from the Purchaser on behalf of MPF and MPF-01, the Cash Proceeds after payment in full of the DIP Loan Claims, (ii) and any funds remaining in (a) the Liquidation Account after payment of the Litigation Trust Amount and all Allowed Administrative Claims (including any Wind-down Costs), Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims and (b) the Wind-down Account after payment of all Wind-down Costs, and (iii) any additional Cash Proceeds that may be payable after the Closing Date as a result of any purchase price adjustment pursuant to the terms of the Assignment and Purchase Agreement.

To the extent that the amounts received as provided in the Plan are less than the amount of the DvB Secured Claim, DvB shall waive the deficiency and shall not become a Holder of a Class 4 General Unsecured Claim against the Debtors with respect to such deficiency.

Voting: Claims in Class 2 are Impaired.  DvB, as the sole Holder of an Allowed Claim in Class 2, shall be entitled to vote to accept or reject the Plan.

Class 3:     Secured Vendor Claims

Classification: Class 3 consists of the Secured Vendor Claims against the Debtors.

Treatment: On the Effective Date each Holder of an Allowed Class 3 Claim, if any, shall receive, on account of, and in full and complete settlement and release of and in exchange for such Allowed Class 3 Claim, distribution of the property securing such claim free and clear of all other liens, claims, and encumbrances; *provided, however,* that if a vendor is a party to a Novation Agreement or possesses collateral that is part of the assets to be transferred to the Purchaser under the terms of the Assignment and Purchase Agreement, such Holder of an Allowed Class 3 Claim shall receive the treatment as set forth in, and under the terms of, the relevant Novation Agreement, to the extent applicable to a particular vendor, and, otherwise, pursuant to the terms of the Assignment and Purchase Agreement.  For the avoidance of doubt, no treatment of such claims shall violate the terms of any applicable Novation Agreement or the terms of the Assignment and Purchase Agreement.

Voting: Class 3 Claims are Impaired.  Each Holder of an Allowed Claim in Class 3 shall be shall be entitled to vote to accept or reject the Plan.

Class 4:     General Unsecured Claims

Classification: Class 4 consists of all General Unsecured Claims against the Debtors, the 2006 Bond Debt Claims, the 2008 Bond Debt Claims, and the Prepetition Tranche B1B and B1A Claims.

Treatment: Each Holder of an Allowed Class 4 Claim shall receive from the Litigation Trust at such times as are determined in the sole discretion of the Litigation Trustee its Pro Rata share of any amounts constituting proceeds from the resolution of Causes of Action.

Voting: Class 4 Claims are Impaired.  Each Holder of an Allowed Claim in Class 4 shall be entitled to vote to accept or reject the Plan.

> Class 5:    Interests

Classification: Class 5 shall consist of the Interests in the Debtors.

Treatment: On the Effective Date, all of the Class 5 Interests outstanding as of the Effective Date shall be extinguished, cancelled and discharged as of the Effective Date.  Pursuant to Bankruptcy Code § 1129(b)(2)(C), Holders of Class 5 Interests shall not be entitled to, nor shall they receive, any distribution or retain any property or interest in property on account of such Class 5 Interest.

Voting: Class 5 Interests are Impaired.  The Holders of Allowed Interests in Class 5 are deemed to have rejected the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

# ARTICLE V

# MEANS FOR IMPLEMENTATION OF THE PLAN

**Section 5.01        Sale of the Acquired Assets**

The Plan contemplates the sale of the Acquired Assets to the Purchaser.  The Debtors will seek authority, in connection with Confirmation of the Plan, to sell the Acquired Assets to the Purchaser, pursuant to the Assignment and Purchase Agreement, attached to the Plan as Exhibit "A," and the relevant Novation Agreements, each of which are attached to the Plan as Exhibit "B," in globo and/or the Confirmation Order with respect to executory contracts that may be assumed and assigned in the absence of a Novation Agreement.  The Confirmation Order shall contain specific authority for the Debtors to comply with the terms and conditions of the Assignment and Purchase Agreement and all related documents and agreements.

The Assignment and Purchase Agreement provides for the assignment by MPF and MPF-01 of all of their right, title, and interest, in and to the Acquired Assets free and clear of all liens, claims, encumbrances, and interests, other than (a) Permitted Encumbrances and (b) any statutory lien or charge held by any Vendor relating to obligations of MPF or MPF-01 under a Vendor Contract, which liens and charges shall be released upon payment of the applicable Cure Amount; *provided, however,* with respect to any lien or charge held by Wärtsilä Norway AS, such lien or charge shall be released upon payment of the payments provided for in Clause 4 of the Wärtsilä Novation Agreement.  The Assignment and Purchase Agreement also provides that the Debtors will transfer to the Purchaser the Debtors' right, title, and interest in (i) certain designs, drawings reports and other records in the possession of the Debtors, and (ii) any equipment, material or facilities for which title or possession has been previously delivered to the Debtors or for the Debtors' benefit under a Vendor Contract in the possession of the original

Vendor or any other Vendor.  MPF will also either transfer its right to build one Multi Purpose Floater, to the extent vested in MPF pursuant to the terms of the Oceania Contract and/or applicable law, or abandon such right.  In addition, MPF will either transfer its right, title, and interest in and to any equipment, material or facilities under the Emtunga Contract or abandon such right.  Further, the Debtors and Cosco have entered into the Cosco Settlement Agreement (attached to the Plan as **Exhibit "C"**), pursuant to which, effective as of the Closing Date, (i) the Cosco Contract shall be terminated, (ii) MPF-01 and Purchaser shall release each other from any and all obligations and liabilities arising under, or relating to, the Cosco Contract, including, in the case of MPF-01, the obligation to pay the Cure Amount to Purchaser (as the vendor under the Cosco Contract), (iii) MPF-01 and Purchaser shall release each other from their respective obligations and liabilities under the Cosco Contract and waive any and all claims or causes of action against each other and their respective related parties in connection with the Cosco Contract, and (iv) MPF and MPF-01 and their affiliates will release and permanently waive any and all claims that any of them had or may have against the issuers of any "refund guarantees" issued to or in favor of any of them at the request of Purchaser under, in connection with or relating to the Cosco Contract.

In addition to, and independent of, any other consideration to be provided under the Assignment and Purchase Agreement for the purchase and sale of the Acquired Assets, the Purchaser will (a) make a cash payment of $104,000,000.00 in United States of America Dollars to MPF and MPF-01 on the Closing Date, in full, without any deduction, withholding or set-off, and free of all bank charges, (b) assume the Assumed Liabilities in accordance with the Novation Agreements and/or the Confirmation Order, and (c) release MPF-01 from its obligation to pay the Cure Amount under the Cosco Contract.  In addition, under the terms of Section 2.6(c) of the Assignment and Purchase Agreement, the Purchaser may make an additional cash payment to MPF to the extent that the aggregate amount of the initial cash payment and any excess funds transferred to DvB pursuant to Section 4.02 of the Plan, is less than (ii) the aggregate amount of the DIP Loan Claims and the DvB Secured Claim; *provided, however,* that the aggregate amount of the initial cash payment and the additional cash payment shall not exceed $105,000,000.00 United States of America Dollars.[7]

Unless otherwise provided for in an applicable Novation Agreement, pursuant to the terms of the Assignment and Purchase Agreement, the Purchaser will pay all Cure Amounts directly to the Vendors under the Vendor Contracts in accordance with the terms of (a) the relevant Novation Agreement with such Vendor, or (b) any Order of the Bankruptcy Court, including the Confirmation Order providing for the assumption and assignment of a Vendor Contract in accordance with Section 2.4 of the Assignment and Purchase Agreement.  The Cash Proceeds shall be paid by Purchaser, on behalf of the Debtors, to DvB, first, in full satisfaction of all DIP Loan Claims and, second, in satisfaction of the DvB Secured Claim.

Further, under the terms of the Novation Agreement with Wärtsilä Norway AS, Wärtsilä Norway AS will be permitted to call on the DvB Guarantee upon the completion of certain milestone work, and DvB will release the funds held in the cash collateral account supporting the

---

[7] The Debtors' current estimate of the aggregate amount of the DIP Loan Claims and the DvB Secured Claim is approximately $105,220,689.00.

DvB Guarantee to satisfy the payment of the Cure Amount and the completed milestone work. Upon receipt of such payment, Wärtsilä Norway AS agrees to release its rights and interests in and to the DvB Guarantee.

The terms of the Bermuda Orders required the direct or indirect approval of the Joint Provisional Liquidators of the disposition of property of MPF and MPF-01.  In this regard, the Joint Provisional Liquidators sought an order from the Supreme Court of Bermuda authorizing the sale of the Acquired Assets pursuant to the Assignment and Purchase Agreement and all related documents and agreements and the Plan and the implementation of the Plan, subject to the entry of a Confirmation Order by the Bankruptcy Court.

## Section 5.02        The Liquidation Account

All funds remaining in the Liquidation Account as of the Effective Date[8] shall be deemed to be property of the estate and shall be used to pay (i) the Litigation Trust Amount, and (ii) the Allowed Administrative Claims (including any Wind-down Costs), Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims.  To the extent that there are funds remaining after the payment of all Allowed Administrative Claims (including any Wind-down Costs), Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims, such excess funds shall be transferred to DvB as soon as is reasonably practicable.

The Joint Provisional Liquidators shall be permitted to establish a separate Wind-down Account into which they are authorized to transfer, from the Liquidation Account, $300,000.00 to fund the Wind-down Costs.  To the extent that the Wind-down Account is created and funded as provided for in the Plan and funds remain in the account after payment of all Wind-down Costs, such remaining funds shall be transferred to DvB as soon as is reasonably practicable.

## Section 5.03        The Litigation Trust and Litigation Trustee

On the Effective Date, a Litigation Trust will be created for the purpose of pursuing the Causes of Action for the benefit of holders of Allowed Class 4 Claims.  The Litigation Trust will not engage in the conduct of a trade or business.  The Plan shall serve as the trust instrument and no other trust instrument shall be prepared or entered into.  The Debtors and Liquidating MPF are and shall be treated as the Grantors of the Litigation Trust, and the Debtors and Liquidating MPF are owners of the res being transferred to the Litigation Trust.

Excluding any Cause of Action released in connection with or under the Plan or by prior order of the Court, all Causes of Action, including, but not limited to, (i) any Avoidance Action that may exist against any party identified on Exhibits 3(b) or 3(c) of the Debtors' statements of financial affairs, which schedules are incorporated herein by reference and (ii) any Cause of Action against Wilhelm P. Blystad or Oceania AS, are reserved in Liquidating MPF and will be transferred to the Litigation Trust as of the Effective Date, to be pursued by the Litigation Trustee, as a representative of the Estates under Bankruptcy Code § 1123(b)(3)(B) for the benefit of the Holders of Allowed Class 4 Claims.

---

[8] The Debtors estimate that the balance of the Liquidation Account as of the Effective Date will be approximately $2,130,086.00.

With respect to the Holders of the 2006 Bond Debt Claims and the 2008 Bond Debt Claims, all communications and notices provided by the Litigation Trustee shall be provided to the Bond Trustee only, on behalf of the Holders of such Claims. With respect to the Holders of the Prepetition Tranche B1B and B1A Claims, all communications and notices provided by the Litigation Trustee shall be provided to DvB, as facility agent, or any successor facility agent (provided notice of the appointment of such successor agent is provided to the Litigation Trustee, in writing), on behalf of the Holders of such Claims.

Any distribution to be made by the Litigation Trustee to (i) the Holders of the 2006 Bond Debt Claims or the 2008 Bond Debt Claims shall be made to the Bond Trustee, which shall promptly deliver such distributions to the Holders of such Claims in accordance with the provisions of the Plan and the applicable bond documents and (ii) the Holders of the Prepetition Tranche B1B and B1A Claims shall be made to DvB, as facility agent (or any successor facility agent, provided notice of the appointment of such successor facility agent has been provided to the Litigation Trustee in writing in advance of such distribution), which shall promptly deliver such distributions to the Holders of such Claims in accordance with the provisions of the Plan and the First Lien Credit Agreement. Distributions made to the Bond Trustee or DvB, as facility agent (or any successor facility agent), as applicable, shall constitute distributions to Holders of Allowed 2006 Bond Debt Claims and 2008 Bond Debt Claims or Prepetition Tranche B1B and B1A Claims, as the case may be, regardless of whether the Bond Trustee or DvB, as facility agent (or any successor facility agent), makes subsequent distributions to such Holders. Further, the Bond Trustee shall be responsible for obtaining all tax compliance and tax reporting documents, if applicable, from the Holders of the 2006 Bond Debt Claims and the 2008 Bond Debt Claims, and DvB, as facility agent (or any successor facility agent), shall be responsible for obtaining all tax compliance and tax reporting documents, if applicable, from the Holders of the Prepetition Tranche B1B and B1A Claims.

The Litigation Trustee will have the right to prosecute and enforce any rights to payment of claims or other rights and Causes of Action that the Debtors, Liquidating MPF, or the Estates may hold against any Person (except to the extent waived, settled, or released under the Plan or by prior order of the Bankruptcy Court). The Litigation Trustee will have the right to assert any claims or Causes of Action that the Debtors, Liquidating MPF, or the Estates may hold against any Person asserting any Claim (other than a DvB Secured Claim, a DIP Loan Claim, an Allowed Administrative Expense Claim, an Allowed Priority Tax Claim, or an Allowed Priority Non-Tax Claim) against the Debtors, Liquidating MPF, or the Estates; *provided, however,* nothing herein shall restrict the right of the Joint Provisional Liquidators or any liquidator subsequently appointed in the Bermuda Proceedings from bringing any claim or cause of action belonging to such Joint Provisional Liquidator or liquidator, as the case may be, arising under Bermuda law as a result of the commencement of the Bermuda Proceedings. In the event the Joint Provisional Liquidators bring such a cause of action, any net proceeds of such cause of action shall be transferred to the Litigation Trust.

Entry of the Confirmation Order shall constitute the official appointment of the Litigation Trustee. The Committee will select the Litigation Trustee on or before the Confirmation Hearing. The Confirmation Order will contain the name of such individual or entity selected to serve as Litigation Trustee. The Litigation Trustee shall, for the Litigation Trust, receive, administer, hold and distribute, in accordance with the Plan, (i) the Litigation Trust Amount, and

(ii) all proceeds of the Causes of Action in accordance with the terms and provisions of the Plan. All holders of Allowed Class 4 Claims shall be the beneficiaries of the Litigation Trust, but any professionals hired by the Litigation Trust will report solely to the Litigation Trustee.  The Litigation Trustee, if required by applicable law, shall file federal income tax returns for the Litigation Trust pursuant to the applicable provisions of the Internal Revenue Code.

On the Effective Date, or as soon as reasonably practicable thereafter, (i) the Debtors and Liquidating MPF, or the Joint Provisional Liquidators, on behalf of Liquidating MPF, shall transfer $125,000.00 from the Liquidation Account, and (ii) the Debtors and Liquidating MPF shall transfer the Causes of Action, to the Litigation Trust for the benefit of the Holders of Allowed Class 4 Claims.

Any Unclaimed Funds shall be redistributed by the Litigation Trustee Pro Rata to those Holders of Allowed Class 4 Claims who can be located by the Litigation Trustee with reasonable diligence and who execute all appropriate documents.

Upon the resolution of all Allowed Class 4 Claims, by payment in full, and payment of all Litigation Trust expenses, any remaining portion of the Litigation Trust Amount or the proceeds of the resolution of Causes of Action in the possession of the Litigation Trust shall be turned over to DvB.

The conveyance of the Causes of Action shall be accomplished pursuant to the Plan and the Confirmation Order and shall be completed and effective upon the occurrence of the Effective Date, without the need of further documentation or instruments of conveyance, other than the Plan and the Confirmation Order.  The Litigation Trust shall have and continue to have all rights to access the books and records (including but not limited to the accounting books and records and the corporate books and records) of the Debtors and Liquidating MPF that the Debtors, Liquidating MPF, the Joint Provisional Liquidators, and their professionals had immediately prior to the Effective Date.

The Litigation Trust will have full authority to compromise or settle claims and Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order.  Without limiting the generality of the foregoing, the Litigation Trust may, without application to or approval by the Bankruptcy Court, hire professionals and pay from the Litigation Trust professional fees and expenses incurred after the Effective Date to the extent that funds are available in the Litigation Trust for such payment.

The Litigation Trustee shall be entitled to be compensated out of the Litigation Trust, without approval of the Bankruptcy Court, in an amount equal to the compensation set forth for trustees under Bankruptcy Code § 326(a).

Under no circumstances shall the Litigation Trust be liable for any tax claim that is a Priority Tax Claim or Administrative Claim.

The Litigation Trust shall be responsible for paying all statutory fees arising under 28 U.S.C. § 1928 after the Effective Date.

The formal name of the Litigation Trust shall be the "MPF Litigation Trust."

**Section 5.04       Abandonment or Transfer of Other Assets**

All of the Other Assets shall be abandoned pursuant to Bankruptcy Code § 554(a) as being of inconsequential value and of no benefit to the Debtors or the Creditors.

**Section 5.05       Authorization for Transactions**

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors and Liquidating MPF may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan or the Transfer, including: (a) the execution and delivery of appropriate agreements or other documents containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; and (c) all other actions that the Debtors or Liquidating MPF determine are necessary or appropriate.

**Section 5.06       Effectuating Documents; Winding-Up Transactions**

After the Effective Date, with respect to MPF Holding, the chairman of the board of directors, the chief executive officer, and chief financial officer of MPF, and with respect to the Bermuda Debtors, the chairman of the board of directors, the chief executive officer, and chief financial officer of MPF Corp or the Joint Provisional Liquidators (or, to the extent appointed in the Bermuda Proceedings for the purposes of winding-down the Bermuda Debtors, any liquidator or joint liquidators) shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and the winding-up of MPF Holding and the Bermuda Debtors, as applicable.  The officers and directors will continue to be compensated after Confirmation at the same rates as prior to Confirmation for the period deemed necessary to accomplish the winding down of the Debtors.

**Section 5.07       Exemption from Certain Transfer Taxes**

Pursuant to Bankruptcy Code § 1146(a), the issuance, transfer, or exchange of a security, or the making of delivery of an instrument of transfer, including any transfers of property of the Debtors effected pursuant to the Assignment and Purchase Agreement or as provided under the Plan, from the Debtors to the Purchaser, the Litigation Trust or any other Person or Entity pursuant to the Plan or the Assignment and Purchase Agreement, as applicable, may not be taxed under any law imposing a stamp tax or similar tax, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**Section 5.08      Closing of the Debtors' Chapter 11 Cases.**

When all Disputed Claims filed against a Debtors have become Allowed Claims or have been disallowed by Final Order or otherwise pursuant to the Plan, and all appropriate distributions pursuant to the Plan have been made pursuant to the Plan, the Litigation Trustee shall seek authority from the Bankruptcy Court to close such Debtor's Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE VI

## PROVISIONS GOVERNING DISTRIBUTIONS

**Section 6.01      Timing and Delivery of Distributions**

Distributions from the Litigation Trust shall be governed by the terms of Section 4.03 of the Plan and the terms of Article V and other relevant provisions of the Plan.

**Section 6.02      Method of Cash Distributions**

Any Cash payment to be made pursuant to the Plan or by the Litigation Trustee may be made by Cash, draft, check, wire transfer, or as otherwise required or provided in any relevant agreement or applicable law at the option of and in the sole discretion of the Liquidating MPF or the Litigation Trustee, as applicable, except for Cash payments made by the Purchaser to DvB pursuant to the Assignment and Purchase Agreement or to any Vendor pursuant to a Novation Agreement, which shall be made by wire transfer or such other method as may be specified by DvB with respect to any payment to DvB or the applicable Novation Agreement with respect to payments to be made thereunder.

**Section 6.03      Compliance with Tax Requirements**

In connection with each distribution with respect to which the filing of an information return (such as an Internal Revenue Service Form 1099 or 1042) or withholding is required, the Litigation Trustee shall file such information return with the Internal Revenue Service and provide any required statements in connection therewith to the recipients of such distribution or effect any such withholding and deposit all moneys so withheld as required by law.  With respect to any Person from whom a tax identification number or other tax information required by law to avoid withholding has not been received by the Litigation Trustee within thirty (30) days from the date of such request, the Litigation Trustee may, at its option, withhold the amount required and distribute the balance to such Person or decline to make such distribution until the information is received.

**Section 6.04      De Minimis Distributions**

No Cash payment of less than five ($5.00) dollars shall be made to the Holder of any Claim on account of its Allowed Claim.

**Section 6.05        Setoffs**

Except with respect to the DIP Loan Claims and the DvB Secured Claim or as otherwise expressly provided for in the Plan, pursuant to the Bankruptcy Code (including Bankruptcy Code § 553), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim or Interest, each Debtor, Liquidating MPF, or the Litigation Trustee, as the case may be, may setoff against any Allowed Claim or Interest and the distribution to be made pursuant to the Plan on account of such Allowed Claim or Interest (before such distribution is made), any claims, rights, and Causes of Action of any nature that such Debtor, Litigation Trustee, or Liquidating MPF may have or had against the Holder of such Allowed Claim or Interest, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release by such Debtor, Litigation Trustee or Liquidating MPF of any such claims, rights, and Causes of Action that may exist against such Holder.

## ARTICLE VII

## EXECUTORY CONTRACTS, UNEXPIRED LEASES, AND OTHER AGREEMENTS

**Section 7.01        Assumption/Rejection**

The Debtors will assume and assign to the Purchaser all executory contracts identified on **Schedule 1** to the Plan pursuant to each applicable Novation Agreement.

On the Effective Date, and to the extent permitted by applicable law, all of the Debtors' executory contracts and unexpired leases will be rejected unless such executory contract or unexpired lease: (a) is being assumed pursuant to the Plan or the Assignment and Purchase Agreement and the applicable Novation Agreement; (b) is the subject of a motion to assume filed on or before the Confirmation Date; or (c) has been previously rejected or assumed.

**Section 7.02        Cure Amounts**

The Cure Amount with respect to any executory contract to be assigned pursuant to the terms of the Assignment and Purchase Agreement and a Novation Agreement shall be the amount set forth in the applicable Novation Agreement and identified on Schedule 1 to the Plan.

**Section 7.03        Claims Based on Rejection of Executory Contracts and Unexpired Leases**

Unless otherwise provided by a Bankruptcy Court order, any proofs of Claim asserting Claims arising from the rejection of the Debtors' executory contracts and unexpired leases pursuant to the Plan or otherwise must be filed no later than thirty (30) days after the later of the Effective Date or the effective date of rejection.  Any proofs of Claim arising from the rejection of the Debtors' executory contracts or unexpired leases that are not timely filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against any Debtor or the Litigation Trust without the need for any objection by any Person or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection of the executory contract or unexpired lease shall be deemed fully satisfied and

released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of the Debtors' executory contracts and unexpired leases shall be classified as General Unsecured Claims; provided however, if the Holder of an Allowed Claim for rejection damages has an unavoidable security interest in any Collateral to secure obligations under such rejected executory contract or unexpired lease, the Allowed Claim for rejection damages shall be treated as a Secured Vendor Claim to the extent of the value of such Holder's interest in the Collateral, with the deficiency, if any, treated as a General Unsecured Claim.

**ARTICLE VIII**

**PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS**

**Section 8.01      Objections to Claims**

        *(a)      Authority.*

          (i)      *Administrative Claims, Priority Tax Claims, Priority Non-Tax Claim.* Liquidating MPF shall have the exclusive right to file objections to any Administrative Claim, Priority Tax Claim, Priority Non-Tax Claim or Secured Vendor Claim and to withdraw any objections to such Claims that they file. The Debtors, and, after the Effective Date, Liquidating MPF, shall have the exclusive authority to settle, compromise, or litigate to judgment any objections to such Claims (i) if they have the prior written consent of DvB, (ii) if they have given detailed written notice of the proposed settlement, compromise or litigation to DvB and DvB has not objected thereto within five (5) Business Days after receipt of such notice, or (iii) upon the Order of the Bankruptcy Court after DvB has had notice and an opportunity to object.

          (ii)      *General Unsecured Claims*      The Litigation Trustee shall have the exclusive authority to settle, compromise, or litigate to judgment any objections to General Unsecured Claims. From and after the Effective Date, the Litigation Trustee may settle or compromise any Disputed General Unsecured Claim without approval of the Bankruptcy Court. The Litigation Trustee also shall have the right to resolve any Disputed General Unsecured Claim outside the Bankruptcy Court under applicable governing law.

        *(b)      Objection Deadline*

        No later than the Claims Objection Deadline, the Litigation Trustee, with respect to General Unsecured Claims, may file objections with the Bankruptcy Court and serve such objections on the Creditors holding the Claims to which such objections are made. Nothing contained in the Plan, however, shall limit the right of the Litigation Trustee to object to Claims, if any, filed or amended after the Claims Objection Deadline. The Claims Objection Deadline may be extended by the Bankruptcy Court upon motion by the Litigation Trustee without notice or hearing.

**Section 8.02          No Distributions Pending Allowance**

Notwithstanding any other provision of the Plan, no payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some severable portion thereof, has become an Allowed Claim.

**Section 8.03          Distributions After Allowance**

(i)          *Administrative Claims, Priority Tax Claims, and Non-Tax Priority Claims*. Liquidating MPF (or the Joint Provisional Liquidators, on behalf of Liquidating MPF) shall make payments and distributions from the Liquidation Account to each Holder of a Disputed Administrative Claim, Priority Tax Claim, or Non-Tax Priority Claim that has become an Allowed Claim as soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing all or part of any Disputed Claim becomes a Final Order or the Claim becomes an Allowed Claim.

(ii)          *General Unsecured Claims and the Litigation Trust*. The Litigation Trustee shall make payments and distributions from a distribution reserve formed as part of the Litigation Trust to each Holder of a Disputed General Unsecured Claim that has become an Allowed General Unsecured Claim as soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing all or part of any Disputed General Unsecured Claim becomes a Final Order.  After a Disputed General Unsecured Claim is Allowed or otherwise resolved, the excess Cash or other property that was reserved on account of such Disputed General Unsecured Claim, if any, shall become property of the Litigation Trust for the benefit of other Allowed General Unsecured Claims of the Class for which the distribution reserve was created.

**Section 8.04          Reduction of Claims**

Notwithstanding the contents of the Schedules, Claims listed therein as undisputed, liquidated and not contingent shall be reduced by the amount, if any, that was paid by the Debtors or otherwise prior to the Effective Date, including pursuant to orders of the Bankruptcy Court.  To the extent such payments are not reflected in the Schedules, such Schedules will be deemed amended and reduced to reflect that such payments were made.  Within 30 days after the Effective Date, Liquidating MPF (or the Joint Provisional Liquidators on behalf of Liquidating MPF) will provide the Litigation Trustee with a list or lists of payments made from the Estates since the Petition Date.  Nothing in the Plan shall preclude Liquidating MPF (or the Joint Provisional Liquidators) or the Litigation Trustee from paying Claims that the Debtors were authorized to pay pursuant to any Final Order entered by the Bankruptcy Court prior to the Effective Date.

**Section 8.05          Compliance with Tax Requirements/Allocations**

In connection with the Plan, to the extent applicable, the Litigation Trustee shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Litigation Trustee shall be

authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of a distribution to generate sufficient funds to pay applicable withholding taxes with respect to such distribution, withholding distributions pending receipt of information necessary to facilitate such distribution, or establishing any other mechanisms it believes are reasonable and appropriate.

## ARTICLE IX

## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

**Section 9.01        Conditions Precedent to Confirmation**

The following are conditions precedent to the occurrence of Confirmation, each of which must be satisfied or waived in accordance with Section 9.04 below:

(a)        The Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to the Debtors, the Joint Provisional Liquidators, the Purchaser, and DvB, approving the adequacy of the Disclosure Statement.

(b)        The Confirmation Order approving and confirming the Plan, as such Plan may have been modified, amended or supplemented, shall (i) be in form and substance reasonably acceptable to the Debtors, the Joint Provisional Liquidators, the Purchaser, and DvB; and (ii) include a finding of fact that Liquidating MPF, and its respective present and former members, officers, directors, managers, employees, advisors, attorneys and agents, acted in good faith within the meaning of and with respect to all of the actions described in Bankruptcy Code § 1125(e) and are therefore not liable for the violation of any applicable law, rule, or regulation governing such actions.

(c)        Execution of the Assignment and Purchase Agreement by all parties thereto.

(d)        The Debtors shall have sufficient Cash on hand to fund the Liquidation Account, the amount of which shall be acceptable to, and agreed to by, DvB.

**Section 9.02        Conditions Precedent to Effective Date**

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in accordance with Section 9.04 below:

(a)        The Confirmation Order shall have been entered in form and substance reasonably acceptable to the Debtors, the Joint Provisional Liquidators, the Purchaser, and DvB, and such Order shall have become a Final Order.

(b)        An order from the Supreme Court of Bermuda approving the transactions contemplated under the Plan and the Assignment and Purchase Agreement shall have been entered and shall have become a Final Order.

(c)     The Closing shall have occurred pursuant to the Assignment and Purchase Agreement.

(d)     In accordance with Section 2.03 of the Plan, the DIP Loan Claims shall have been paid in full in Cash from the Cash Proceeds.

(e)     In accordance with Section 3.03(b) of the Plan, the Holder of the DvB Secured Claim shall have received all remaining Cash Proceeds after payment in full of the DIP Loan Claims.

**Section 9.03      Substantial Consummation**

On the Effective Date, the Plan shall be deemed to be substantially consummated under Bankruptcy Code §§ 1101 and 1127(b).

**Section 9.04      Waiver of Conditions**

Each of the conditions set forth in Section 9.01 or Section 9.02 hereof may be waived in whole or in part by the Debtors with the prior written consent of DvB and Purchaser (as applicable), which consent shall not be unreasonably withheld.  The failure to satisfy or waive any condition to Confirmation or the Effective Date may be asserted by the Debtors or DvB regardless of the circumstances giving rise to the failure of such condition to be satisfied.

**Section 9.05      Revocation, Withdrawal, or Non-Consummation**

The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date and to file subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation of the Plan does not occur, then (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Class of Claims) unless otherwise agreed to by the Debtors and any counterparty to such settlement or compromise, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (iii) nothing contained in the Plan, and no acts taken in preparation for Consummation of the Plan, shall (a) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors or any other Person, (b) prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors, or (c) constitute an admission of any sort by the Debtors or any other Person.

# ARTICLE X

# AMENDMENTS AND MODIFICATIONS

The Debtors may alter, amend, or modify the Plan or any exhibits thereto under Bankruptcy Code § 1127(a) at any time prior to the Confirmation Date; provided, however, that where the Plan requires a document to be acceptable to, consented to, agreed to or otherwise satisfactory to DvB, the Purchaser, or a Vendor under a Novation Agreement, the Debtors may not modify such document without the written consent of DvB, the Purchaser, or such Vendor, as applicable.  After the Confirmation Date and prior to "substantial consummation" of the Plan, as

provided in Section 8.03 of the Plan, the Debtors may, under Bankruptcy Code § 1127(b), institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of the Plan, so long as such proceedings do not (i) materially adversely affect the treatment of Holders of Claims or Interests under the Plan or (ii) modify any provision of the Assignment and Purchase Agreement or any of the Purchaser's rights thereunder without the Purchaser's consent; provided, however, that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court.

## ARTICLE XI

## RETENTION OF JURISDICTION

Under Bankruptcy Code §§ 105(a) and 1142, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

A.     Allow, disallow, determine, liquidate, classify, estimate or establish the priority or Secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the Secured or unsecured status, priority, amount or allowance of Claims or Interests;

B.     Hear and determine all applications for compensation and reimbursement of expenses of Professionals under Bankruptcy Code §§ 327, 328, 330, 331, 503(b), 1103 or 1129(a)(4); provided, however, that from and after the Effective Date, the payment of fees and expenses of professionals retained by the Debtors and the Litigation Trust shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

C.     Hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which one or more of the Debtors are parties or with respect to which one or more of the Debtors may be liable, including, if necessary, the nature or amount of any required cure or the liquidating of any claims arising therefrom;

D.     Hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Chapter 11 Cases;

E.     Hear and determine any Avoidance Action brought by the Litigation Trust and all defenses, offsets, or counterclaims asserted thereto;

F.     Enter and enforce such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

G.      Hear and determine disputes arising in connection with the interpretation, implementation, Consummation, or enforcement of the Plan, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

H.      Consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

I.      Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with implementation, Consummation, or enforcement of the Plan or the Confirmation Order;

J.      Enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

K.      Hear and determine any matters arising in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order, the Assignment and Purchase Agreement, or any other contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

L.      Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases or pursuant to the Plan;

M.      Recover all assets of the Debtors, the Litigation Trust, and property of the Estates, wherever located;

N.      Hear and determine matters concerning state, local, and federal taxes in accordance with Bankruptcy Code §§ 346, 505, and 1146;

O.      Hear and determine all disputes involving the existence, nature, or scope of any releases granted in the Plan;

P.      Hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code;

Q.      Enter an order or final decree concluding or closing the Chapter 11 Cases; and

R.      Enforce all orders previously entered by the Bankruptcy Court.

## ARTICLE XII

## COMPROMISES AND SETTLEMENTS

In addition to the Cosco Settlement Agreement, each of the Novation Agreements effect a compromise or settlement among the parties thereto as particularly specified therein.  Further, the Debtors, the Joint Provisional Liquidators, and DvB have entered into a Stipulation dated

June 8, 2010 with the Advisors, pursuant to which the parties thereto, among other things, have agreed (i) that the Advisors shall be entitled to an Allowed Administrative Expense Claim in the amount of $525,000, payable on the Effective Date pursuant to Section 2.01 of this Plan, and (ii) to mutually release each other, as more specifically set forth in the Stipulation, which is attached to the Plan as **Exhibit "D."**

Pursuant to Bankruptcy Code § 363 and Bankruptcy Rule 9019, and in consideration for the classification, distribution and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests and controversies resolved pursuant to the Plan, including, without limitation, all Claims arising prior to the Petition Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, arising out of, relating to or in connection with the business or affairs of, or transactions with, the Debtors.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the compromises or settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, the Estates, Creditors and other parties in interest, and are fair, equitable and within the range of reasonableness.

## ARTICLE XIII

## MISCELLANEOUS PROVISIONS

**Section 13.01**       **Bar Dates for Certain Claims**

### *(a)      Administrative Claim Bar Date*

The Confirmation Order will establish a Bar Date for filing of all Administrative Claims, including substantial contribution claims (but not including Professional Fee Claims, claims for the expenses of the members of the Committee, Claims for Wind-down Costs, and Administrative Claims in subsections (b), (c), or (d) below), which date will be thirty (30) days after the date of the entry of the Confirmation Order (the "Administrative Claims Bar Date").  Holders of asserted Administrative Claims, other than Professional Fee Claims, Claims for Wind-down Costs, Claims for U.S. Trustee fees under 28 U.S.C. § 1930, and administrative ordinary course liabilities described in section (b) below, must submit proofs of Administrative Claim on or before such Administrative Claims Bar Date or forever be barred from doing so.  A notice prepared by the Debtors will set forth such date and constitute notice of this Administrative Claims Bar Date.  Liquidating MPF shall have forty-five (45) days (or such longer period as may be allowed by order of the Bankruptcy Court) following the Administrative Claims Bar Date to review and object to such Administrative Claims before a hearing for determination of allowance of such Administrative Claims.

### *(b)      Administrative Ordinary Course Liabilities*

Holders of Administrative Claims that are based on liabilities incurred and paid by any Debtor in the ordinary course of the applicable Debtor's business (other than Claims of governmental units for taxes and for interest and/or penalties related to such taxes) on and after

the Petition Date shall not be required to file any request for payment of such Administrative Claims.

### (c)    Wind-down Costs

Claims for Wind-down Costs shall be paid in the ordinary course as and when incurred. Holders of Claims for Wind-down Costs shall not be required to file with the Bankruptcy Court any request for payment of such Administrative Claims, unless such Claim is otherwise a Professional Fee Claim, to which the provisions of subsection (d) of  Section 12.01 of the Plan shall apply.

### (d)    Professional Fee Claims

All final requests for compensation or reimbursement of professional fees pursuant to Bankruptcy Code §§ 327, 328, 330, 331, 363, 503(b) or 1103 for services rendered to or on behalf of the applicable Debtors or the Committee prior to the Effective Date (other than substantial contribution claims under Bankruptcy Code § 503(b)(4)) must be filed and served on Liquidating MPF, the Committee, the Litigation Trustee, and DvB and their counsel no later than forty-five (45) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Objections to applications of such Professionals or other entities for compensation or reimbursement of expenses must be filed and served on Debtors' counsel, the Joint Provisional Liquidators, the Committee (if prior to the Effective Date), the Litigation Trustee (if after the Effective Date), DvB and their counsel and the requesting Professional or other entity no later than forty-five (45) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application for compensation or reimbursement was served.

## Section 13.02    Payment of Statutory Fees

On or before the Effective Date, the Debtors shall have paid in full, in Cash (including by check or wire transfer), in U.S. dollars, all fees payable pursuant to section 1930 of title 28 of the United States Code, in the amount determined by the Bankruptcy Court at the Confirmation Hearing.

## Section 13.03    Severability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.   Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.   The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**Section 13.04          Successors and Assigns**

The rights, benefits and obligations of any Person named or referred to in the Plan, including any Holder of a Claim, shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

**Section 13.05          Releases**

*(a)          Releases by Debtors and Estates*

**Except as otherwise expressly provided in the Plan, the Assignment and Purchase Agreement, the Novation Agreements, the Cosco Settlement Agreement, the Stipulation, the DvB Guarantee, or the Confirmation Order, on the Effective Date, to the fullest extent permissible under applicable law, each of the Debtors and Liquidating MPF on its own behalf and as representative of its respective Estate shall, and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally, each and all of the Released Parties of and from any and all claims, Causes of Action (excluding any Avoidance Actions), any and all other obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever based on any act, omission, transaction, event or other circumstance that occurred on or after the Petition Date in connection with or related to any of the Debtors, Liquidating MPF or their respective assets, property and Estates, the Chapter 11 Cases or the Plan, the Assignment and Purchase Agreement and all documents and agreements related thereto, the Disclosure Statement or the Transfer that may be asserted by or on behalf of any of the Debtors, Liquidating MPF or their respective Estates, and any and all Interests or other rights of a Holder of an equity security or other ownership interest, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are or may be based on any act, omission, transaction, event or other circumstance that occurred on or after the Petition Date in connection with or related to any of the Debtors, Liquidating MPF or their respective assets, property and Estates, the Chapter 11 Cases or the Plan, the Assignment and Purchase Agreement and all documents and agreements related thereto, the Disclosure Statement or the Transfer that may be asserted by or on behalf of any of the Debtors, Liquidating MPF or their respective Estates; *provided, however,* that the foregoing shall not operate as a waiver or release by any person of any causes of action arising out of willful misconduct, actual fraud, or criminal conduct that causes damages to any such person.**

**In addition, in consideration of the valuable services provided by the Current Officers, except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, to the fullest extent permissible under applicable law, each of the Debtors and Liquidating MPF on its own behalf and as representative of its respective Estate, shall, and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally, each of the Current Officers of and from any and all claims, Causes of Action (including any Avoidance Actions), any and all other obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever, and any and all Interests or other rights of a Holder of**

an equity security or other ownership interest, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are or may be based in whole or part on any act, omission, transaction, event or other circumstance in connection with or related to any of the Debtors, Liquidating MPF or their respective assets, property and Estates, the Chapter 11 Cases or the Plan, the Assignment and Purchase Agreement or any documents or agreements related thereto, the Disclosure Statement or the Transfer that may be asserted by or on behalf of any of the Debtors, Liquidating MPF or their respective Estates; *provided, however,* that the foregoing shall not operate as a waiver or release by any person of any cause of action arising out of willful misconduct, actual fraud, or criminal conduct that causes damages to any such person.

Furthermore, except for, and subject to, obligations under or as otherwise expressly provided in the Plan, the Assignment and Purchase Agreement, the Novation Agreements, the Cosco Settlement Agreement, the Stipulation, the DvB Guarantee, or the Confirmation Order, on the Effective Date, for good and valuable consideration, including, without limitation, the agreement by DvB to fund these Chapter 11 Cases as evidenced by the DIP Loan Claims and the Litigation Trust Amount, to the fullest extent permissible under applicable law, each of the Debtors and Liquidating MPF on its own behalf and as representative of its respective Estate, and each of its respective Related Persons, shall, and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally DvB and each of its Related Persons of and from any and all claims, Causes of Action (including any Avoidance Actions), any and all other obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to any of the Debtors, Liquidating MPF or their respective assets, property and Estates, the Chapter 11 Cases or the Plan, the Assignment and Purchase Agreement and all documents and agreements related thereto, the Disclosure Statement or the Transfer that may be asserted by or on behalf of any of the Debtors, Liquidating MPF or their respective Estates; *provided, however,* that the foregoing shall not operate as a waiver or release by any person of any causes of action arising out of willful misconduct, actual fraud, or criminal conduct that causes damage to any such person.

### (b)    *Releases by Holders of Claims and Interests*

Except for, and subject to, obligations under or as otherwise expressly provided in the Plan, the Assignment and Purchase Agreement, the Novation Agreements, the Cosco Settlement Agreement, the Stipulation, the DvB Guarantee, or the Confirmation Order, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each Person that has held, currently holds or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, cause of action or liability of any nature whatsoever, or any Interest, or other right of a Holder of an equity security or other ownership interest that is terminated, and each of its respective Related

Persons, shall, and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally each and all of the Released Parties of and from any and all Claims, any and all other obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, those arising under the Bankruptcy Code), and any and all Interests or other rights of a Holder of an equity security or other ownership interest, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to any of the Debtors, Liquidating MPF or their respective assets, property and Estates, the Chapter 11 Cases or the Plan, Assignment and Purchase Agreement or any document or agreement related thereto, the Disclosure Statement or the Transfer; *provided, however,* that the foregoing shall not operate as a waiver or release of any cause of action arising out of willful misconduct, actual fraud, or criminal conduct that caused damages.

(c)  *Injunction Related to Releases*

Except as provided in the Plan, the Assignment and Purchase Agreement, the Novation Agreements, the Cosco Settlement Agreement, the Stipulation, the DvB Guarantee, or the Confirmation Order, as of the Effective Date, (i) all Persons that hold, have held, or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, causes of action or liability of any nature whatsoever, or any Interest or other right of a Holder of an equity security or other ownership interest, relating to any of the Debtors or Liquidating MPF or any of their respective assets, property and Estates, that is released pursuant to Section 12.05 of the Plan, (ii) all other parties in interest, and (iii) each of the Related Persons of each of the foregoing entities, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and of all Interests or other rights of a Holder of an equity security or other ownership interest: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation owed to any Person released under Section 12.05 of the Plan; and (v) commencing or continuing in any manner, in any place of any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order*; provided, however,* that the foregoing shall not operate as an injunction against any person with respect to any cause of action arising out of willful misconduct, actual fraud, or criminal conduct that causes damaged to such person.

### (d)    *Integral to Plan*

Each of the releases and injunctions provided in Section 12.05 of the Plan is an integral part of the Plan and is essential to its implementation.  Each of the Released Parties and any other Persons protected by the injunctions set forth in Section 12.05 of the Plan shall have the right to independently seek the enforcement of such injunctions.

## Section 13.06      Exculpation

The Released Parties SHALL NOT BE LIABLE FOR ANY cause of action arising in connection with or out of the administration of the Chapter 11 Cases, the planning of the Chapter 11 Cases, the formulation, negotiation or implementation of the Plan, the solicitation of acceptances of the Plan, pursuit of Confirmation of the Plan, the Consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for gross negligence or willful misconduct as determined by a Final Order of the Bankruptcy Court.  All Holders of Claims and Interests are enjoined from asserting or prosecuting any Claim or cause of action against any protected person as to which such Released Party has been exculpated from liability pursuant to the preceding sentence.

## Section 13.07      Satisfaction of Claims

The rights afforded in the Plan and the treatment of all Claims and Interests therein shall be in exchange for and in complete satisfaction and release of all Claims and Interests of any nature whatsoever against the Debtors or any of their Estates, assets, properties, or interests in property.  Except as otherwise provided in the Plan, on the Effective Date, all Claims against and Interests in the Debtors shall be satisfied and released in full.  None of the Debtors, Liquidating MPF or their Affiliates, shall be responsible for any pre-Effective Date obligations of the Debtors or Liquidating MPF, except those expressly assumed by the Debtors or Liquidating MPF, as applicable.  Except as otherwise provided in the Plan, all Persons and Entities shall be precluded and forever barred from asserting against the Debtors and their Affiliates, their respective successors or assigns, or their Estates, assets, properties, or interests in property any event, occurrence, condition, thing, or other or further Claims or causes of action based upon any act, omission, transaction, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date, whether or not the facts of or legal bases therefore were known or existed prior to the Effective Date.

## Section 13.08      Disposition of Liabilities

Except as otherwise specifically provided in the Plan or the Confirmation Order, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction and release, effective as of the Effective Date, of all Claims, Interests, and causes of action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and causes of action that arose before the Effective Date, any liability  to the extent such Claims or Interests relate to services performed

by employees of the Debtors prior to the Effective Date and that arise from a termination of employment or a termination of any employee, regardless of whether such termination occurred prior to or after the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in Bankruptcy Code §§ 502(g), 502(h), or 502(i), in each case whether or not: (a) a Proof of Claim or Interest based upon such debt, right, Claim, or Interest is filed or deemed filed pursuant to Bankruptcy Code § 501; (b) a Claim or Interest based upon such Claim, debt, right, or Interest is Allowed pursuant to Bankruptcy Code § 502; or (c) the Holder of such a Claim or Interest has accepted the Plan.  Subject to the terms of the Plan and the Confirmation Order, any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed satisfied on the Effective Date.  Subject to the terms of the Plan, the Confirmation Order shall be a judicial determination of the release and satisfaction of all Claims and Interests subject to the Effective Date occurring.  Subject to the terms of the Plan, the Confirmation Order shall be a judicial determination of the release and satisfaction of all liabilities of the Debtors, their Estates, Liquidating MPF and all successors thereto.  Such release and satisfaction shall void any judgment against the Debtors, their Estates, Liquidating MPF or any successors thereto at any time obtained to the extent it relates to a Claim or Interest released or satisfied, and operates as an injunction against the prosecution of any action against Liquidating MPF or their respective property and assets to the extent it relates to a released or satisfied Claim or Interest.

**Section 13.09    Survival of Indemnification Obligations**

All indemnification obligations of the Debtors shall be released and satisfied on and as of the Effective Date, except for the Indemnification Obligations, which shall remain in full force and effect to the fullest extent allowed by law or contract on and after the Effective Date and shall not be modified, reduced, or otherwise affected in any way by the Chapter 11 Cases but will instead survive and be unaffected by entry of the Confirmation Order.

**Section 13.10    Binding Effect**

The Plan shall be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims against and Interests in the Debtors, their respective successors and assigns, including, but not limited to, the Debtors, and all other parties-in-interest in these Chapter 11 Cases.

**Section 13.11    Term of Injunctions or Stay**

Unless otherwise provided in the Plan or Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under Bankruptcy Code §§ 105 or 362 or otherwise, and in existence on the Confirmation Date (excluding any injunctions or stays contained in the Plan or Confirmation Order), shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or Confirmation Order shall remain in full force and effect in accordance with their terms.

**Section 13.12      Release of Liens**

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors' Estates shall be fully released and discharged.

**In addition, any Holder of a Lien, mortgage, deed of trust, pledge or other security interest released pursuant to the terms of the Plan shall execute such documents as reasonably requested by Liquidating MPF or DvB in form and substance as may be necessary or appropriate to evidence the release of any such mortgages, security interests or Liens of any nature.  If such Holder fails to execute such documents,  Liquidating MPF and/or DvB are authorized to execute such documents on behalf of such Holder and to cause the filing of such documents with any or all governmental or other entities as may be necessary or appropriate to effect such releases.**

**Section 13.13      Dissolution of Committee**

On the Effective Date, the Committee, if any, shall dissolve and the members of the Committee shall be released and discharged from all authority, duties, responsibilities, liabilities, and obligations related to and arising from and in connection with the Chapter 11 Cases.

**Section 13.14      Notices**

Any notice, request, or demand required or permitted to be made or provided under the Plan to or upon the Debtors or Liquidating MPF shall be (i) in writing; (ii) served by (a) certified mail, return receipt requested, (b) hand delivery, (c) overnight delivery service, (d) first class mail, or (e) facsimile transmission; and (iii) deemed to have been duly given or made when actually delivered or, in the case of facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to the Debtors or Liquidating MPF:

MPF Corp. Ltd.
Clarendon House
2 Church Street
Hamilton, HM11 BERMUDA

With a copy to (which shall not constitute notice):

Vinson & Elkins LLP
Attention: D. Bobbitt Noel, Jr.
First City Tower
1001 Fannin Street, Suite 2500
Houston, Texas 77002
Phone: (713) 758-2084
Fax:    (713) 615-5222

**Section 13.15       Governing Law**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of Texas, without giving effect to the principles of conflicts of law thereof, shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control) as well as corporate governance matters with respect to the Debtors; provided, however, that corporate governance matters relating to the Debtors or Reorganized Debtor, as applicable, not organized under Texas law shall be governed by the laws of the state of organization of such Debtor.

**ARTICLE XIV**

**THE SOLICITATION; VOTING PROCEDURES**

**Section 14.01       Solicitation Package**

For Holders of Claims other than 2006 Bond Debt Claims and 2008 Bond Debt Claims, accompanying this Disclosure Statement for the purpose of soliciting votes on the Plan are copies of (i) the Plan; (ii) the notice of, among other things, the time for submitting Ballots to accept or reject the Plan, the date, time, and place of the hearing to consider Confirmation of the Plan, the final hearing on this disclosure statement, and related matters, and the time for filing objections to the disclosure statement and to Confirmation of the Plan; and, as applicable, (iii) a Ballot or Ballots (collectively the "Solicitation Package").  Only Holders eligible to vote in favor of or against the Plan will receive a Ballot(s) as part of their Solicitation Package.  If you did not receive a Ballot and believe that you should have, please contact the Debtors at the address or telephone number set forth in the next subsection.

For Holders of 2006 Bond Debt Claims and 2008 Bond Debt Claims, the Bond Trustee will (i) deliver a Notice to Bondholders, a copy of the Disclosure Statement, and a beneficial owner ballot for the 2006 Bond Debt Claims and 2008 Bond Debt Claims to such beneficial owners or their applicable custodians, and (ii) post a copy of the Notice to Bondholders and the Disclosure Statement on the website www.stamdata.no, and, provide, at the request of any beneficial owner of a 2006 Bond Debt Claim or 2008 Bond Debt Claim, a copy of the Disclosure Statement and applicable beneficial owner ballot.

**Section 14.02       Voting Instructions**

After carefully reviewing the Plan and this Disclosure Statement, and the Exhibits thereto, and the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on Ballot. Please complete and sign your Ballot and return it to the Balloting Agent or the Bond Trustee, as applicable, so that it is RECEIVED on or before the Voting Deadline set forth on the Ballot.

If you have any questions about the procedure for voting your eligible Claim or with respect to the Solicitation Package that you have received, please contact the Balloting Agent at:

Vinson & Elkins L.L.P.
Attn: Cindy Whitman
First City Tower
1001 Fannin Street, Suite 2500
Houston, TX 77002-5061
Tel: 713.758.2509; E-mail: cwhitman@velaw.com

**IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE ACTUALLY RECEIVED ON OR BEFORE JUNE 4, 2010 AT THE ABOVE ADDRESS. EXCEPT TO THE EXTENT ALLOWED BY THE BANKRUPTCY COURT OR DETERMINED OTHERWISE BY THE DEBTORS, BALLOTS OR MASTER BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE ACCEPTED OR USED IN CONNECTION WITH THE DEBTORS' REQUEST FOR CONFIRMATION OF THE PLAN OR ANY MODIFICATION THEREOF.**

**YOU MAY SUBMIT A BALLOT ELECTRONICALLY, INCLUDING VIA EMAIL OR FACSIMILE. ONLY BALLOTS RECEIVED BY THE BALLOTING AGENT BY THE VOTING DEADLINE WILL BE COUNTED.**

**Section 14.03        Voting Tabulation**

Under the Bankruptcy Code, for purposes of determining whether the requisite acceptances have been received, only Holders who actually vote will be counted.  The failure of a Holder to deliver a duly executed Ballot will be deemed to constitute an abstention by such Holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted.

Except as provided below, unless the applicable Ballot or Master Ballot is timely submitted to the Balloting Agent before the Plan Voting Deadline, together with any other documents required by such Ballot or Master Ballot, the Debtors may, in their sole discretion, reject such Ballot or Master Ballot as invalid and decline to utilize it in connection with seeking Confirmation of the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to Bankruptcy Code § 1126(e), that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another acting in a fiduciary or representative capacity, such Person should indicate such capacity when signing and, unless otherwise determined by the Debtors, must submit proper evidence satisfactory to the Debtors of authority to so act.

The period during which Ballots with respect to the Plan will be accepted by the Debtors will terminate on the Voting Deadline. Except to the extent permitted by the Bankruptcy Court,

Ballots that are received after the Voting Deadline will not be counted or otherwise used by the Debtors in connection with the Debtors' request for Confirmation of the Plan (or any permitted modification thereof). IN NO CASE SHOULD A BALLOT OR MASTER BALLOT BE DELIVERED TO ANY ENTITY OTHER THAN THE BALLOTING AGENT.

## ARTICLE XV

## BEST INTEREST OF THE CREDITORS AND LIQUIDATION

### Section 15.01     Best Interest of Creditors Test

Before the Plan may be confirmed, the Bankruptcy Court must find (with certain exceptions) that the Plan provides, with respect to each Class, that each Holder of a Claim or interest in such Class either: (a) has accepted the Plan; or (b) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such person would receive or retain if the Debtors liquidated under chapter 7 of the Bankruptcy Code.  In chapter 7 liquidation cases, unsecured creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior Class receiving any payments until all amounts due to senior Classes have been paid fully or any such payment is provided for:

- Secured creditors (to the extent of the value of their collateral);

- Administrative and other priority creditors;

- Unsecured creditors;

- Debt expressly subordinated by its terms or by order of the Bankruptcy Court; and

- Interest holders.

The Debtors believe that the value of any distributions in a chapter 7 case would be less than the value of distributions under the Plan because, among other reasons, none of the Vendor contracts would likely be assumed or assigned in a chapter 7 liquidation, and, consequently, the approximate aggregate cure amounts under the Vendor Contracts of at least $60,000,000.00 being satisfied under the Plan would not be paid in a liquidation.

## ARTICLE XVI

## CONFIRMATION PROCEDURES

### Section 16.01     The Confirmation Hearing

Bankruptcy Code § 1128(a) requires the Bankruptcy Court, after notice, to hold a Confirmation Hearing. Bankruptcy Code § 1128(b) provides that any party in interest may object to Confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing for **June 9, 2010, at 9:00 a.m., prevailing Central Time**, before the Honorable Jeff Bohm, United States Bankruptcy

Judge, United States Bankruptcy Court for the Southern District of Texas at the United States Courthouse, 515 Rusk Street, Houston, Texas 77002.

Objections to Confirmation of the Plan must be filed and served on the Debtors and the other parties set forth in the order approving the Disclosure Statement, and certain other parties, by no later than **June 4**, **2010**, in accordance with the order approving the Disclosure Statement. THE BANKRUPTCY COURT MAY NOT CONSIDER OBJECTIONS TO CONFIRMATION OF THE PLAN IF ANY SUCH OBJECTIONS HAVE NOT BEEN TIMELY SERVED AND FILED IN COMPLIANCE WITH THE ORDER APPROVING THE DISCLOSURE STATEMENT.

The notice of the Confirmation Hearing will contain, among other things, the deadline to object to Confirmation of the Plan, the Plan Voting Deadline, and the date and time of the Confirmation Hearing.

## Section 16.02        Statutory Requirements for Confirmation of the Plan

The Debtors believe that: (a) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (b) it has complied or will have complied with all of the requirements of chapter 11; and (c) the Plan has been proposed in good faith.

## Section 16.03        Amendments, Modification, or Withdrawal of Plan

The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan or any Exhibit or Schedule, including to amend or modify it to satisfy Bankruptcy Code § 1129(b), if necessary.

## Section 16.04        Identity of Persons to Contact for More Information

Any interested party desiring further information about the Plan should contact the Balloting Agent at the phone number and/or address listed in Section 14.02 of this Disclosure Statement.

## Section 16.05        Risks Related to the Sale of the Debtors' Assets

The Bankruptcy Court has not yet approved a sale of the Debtors' assets.  Further, the Assignment and Purchase Agreement is subject to certain conditions precedent which must be satisfied before the transaction is consummated.  There is no guarantee that these conditions precedent will be satisfied or that the Bankruptcy Court will approve a sale of the Acquired Assets to the Purchaser.

## ARTICLE XVII

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives to the Plan include: liquidation of the Debtors under chapter 7 of the Bankruptcy Code or dismissal of the Chapter 11 Cases.

**Section 17.01        Liquidation Under Chapter 7**

If no plan can be confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed (or elected) to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and Interests is set forth below. The Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of: (a) the likelihood that the assets of the Debtors would have to be sold or otherwise disposed of in a less orderly fashion over a shorter period of time; (b) additional administrative expenses involved in the appointment of a trustee; and (c) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations.

Specifically, the Debtors' costs of liquidation under chapter 7 of the Bankruptcy Code would include the fees payable to a chapter 7 trustee, as well as those fees that might be payable to attorneys and other Professionals that such a trustee might engage. In addition, claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors during the pendency of the Chapter 11 Cases. The foregoing types of claims and other claims that might arise in a liquidation case or result from the pending Chapter 11 Cases, including any unpaid expenses incurred by the Debtors and the Committee during the Chapter 11 Cases such as compensation for attorneys, financial advisors and accountants, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition Allowed General Unsecured Claims.

To determine if the Plan is in the best interests of each Impaired Class, the value of the distributions from the proceeds of a liquidation of the Debtors' unencumbered assets and properties, after subtracting the amounts attributable to the foregoing claims, are then compared with the value of the property offered to such Classes of Claims and Interests under the Plan.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to the Holders of Claims and Interests in the Chapter 11 Cases, including (i) the increased costs and expenses of a liquidation under chapter 7 of the Bankruptcy Code arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) the likely erosion in value of assets in a chapter 7 case in the context of an expeditious liquidation and the "forced sale" atmosphere that would prevail under a chapter 7 liquidation and (iii) the substantial increases in Claims which would be satisfied on a priority basis or on parity with creditors in the Chapter 11 Cases, the Debtors have determined that Confirmation of the Plan will provide each holder of an Allowed Claim or Interest with a recovery that is not less than such holder would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

# ARTICLE XVIII

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY PERSON FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON SUCH PERSON UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) EACH PERSON SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to U.S. Holders and, to a limited extent, Non-U.S. Holders (as each is defined below) of Claims. This summary is based on the Internal Revenue Code of 1986, as amended (the "Code"), the U.S. Treasury Regulations (the "Treasury Regulations") promulgated thereunder, judicial authorities, published administrative positions of the Internal Revenue Service ("IRS") and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. We cannot assure you that the IRS will not challenge one or more of the tax consequences described in this Disclosure Statement or that a court would not sustain a different position than any position discussed herein, and we have not obtained, nor do we intend to obtain, a ruling from the IRS or an opinion of counsel with respect to the U.S. federal tax consequences discussed herein. Events occurring after the date of this Disclosure Statement, including changes in law and changes in administrative positions, could affect the U.S. federal income tax consequences of the Plan.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to such Holders in light of their individual circumstances or to Holders subject to special treatment under the U.S. federal income tax laws (including, for example, banks and other financial institutions, governmental authorities or agencies, pass-through entities or holders of interests therein, dealers and traders in securities, insurance companies, tax-exempt organizations, certain U.S. expatriates, persons subject to the alternative minimum tax and regulated investment companies). In addition, this summary does not address the federal income tax consequences of Holders of Interests not entitled to vote on the Plan and the estate, gift, foreign, state, or local tax consequences of the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim that is, for United States federal income tax purposes: (i) an individual who is a U.S. citizen or U.S. resident alien; (ii) a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, that was created or organized in or under the laws of the United States, any state thereof or the District of Columbia; (iii) an estate whose income is subject to U.S. federal income taxation regardless of its source; or (iv) a trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons have the authority to control all substantial decisions of the trust, or that has a valid election in

effect under applicable Treasury Regulations to be treated as a United States person.  A "Non-U.S. Holder" is a Holder of a Claim that is an individual, corporation, estate or trust that is not a U.S. Holder.

If an entity treated as a partnership for U.S. federal income tax purposes is a Holder of Claims, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partnership. If you are a partner of a partnership that is a Holder of Claims, you are urged to consult your own tax advisor about the U.S. federal income tax consequences to you of the consummation of the Plan.

**This summary of certain United States federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a Holder of an Allowed Claim. All holders are urged to consult their own tax advisors as to the United States federal, state, local and non-United States tax consequences of the plan.**

**Section 18.01    U.S. Federal Income Tax Considerations to U.S. Holders of Allowed Claims**

### (a)    *U.S. Holders of DvB Secured Claims*

Pursuant to the Plan, each U.S. Holder of an Allowed DvB Secured Claim will receive from the Purchaser, in full and complete settlement, release and discharge of and in exchange for such Claim, its Pro Rata share of the Cash Proceeds after payment in full of the DIP Loan Claims.  If the DvB Secured Claim is a capital asset in the hands of the U.S. Holder, the U.S. Holder would recognize capital gain or loss (which capital gain or loss would be long-term capital gain or loss to the extent that the U.S. Holder has held the debt instrument underlying its claim for more than one year) in an amount equal to the amount of Cash received over the U.S. Holder's adjusted basis in the debt instruments underlying its Allowed DvB Secured Claim. To the extent that a portion of the Cash received represents accrued but unpaid interest that the Holder has not already taken into income, the U.S. Holder should recognize ordinary interest income. See "Accrued but Unpaid Interest" below.

### (b)    *U.S. Holders of Secured Vendor Claims*

Pursuant to the Plan, each U.S. Holder of an Allowed Secured Vendor Claim will receive on account of, and in full and complete settlement, release and discharge of and in exchange for such Claim, distribution of the property securing such claim free and clear of all other liens, claims, and encumbrances.  The U.S. Holder should recognize income or loss in an amount equal to the difference between the fair market value of the property received and the U.S. Holder's adjusted basis in the Claim.  If the Claim is held as a capital asset, the U.S. Holder will recognize capital gain or loss (which capital gain or loss would be long-term capital gain or loss to the extent that the U.S. Holder has held the debt instrument underlying its claim for more than one year) on the receipt of property in exchange for the Claim. The U.S. Holder's tax basis in the property received should be equal to the fair market value of the property on the Effective Date, and the U.S. Holder's holding period in the property should begin on the day following the Effective Date.  To the extent that a portion of the property received in the exchange is allocable

to accrued interest that has not already been taken into income by the U.S. Holder, the U.S. Holder should recognize ordinary interest income.  See "Accrued but Unpaid Interest" below.

### (c)      U.S. Holders of General Unsecured Claims

Pursuant to the Plan, each U.S. Holder of a General Unsecured Claims will receive from the Litigation Trust its Pro Rata share of any amounts constituting proceeds from the resolutions of Causes of Action.  A U.S. Holder receiving a payment under the Plan in satisfaction of its Allowed General Unsecured Claim generally may recognize taxable income or loss measured by the difference between (i) the amount of Cash received and (ii) its adjusted tax basis in the Claim.   If the payments may be received over more than one year, the U.S. Holder may be required to allocate its basis and calculate its income or loss (and any imputed interest) with respect to each payment under the installment sale rules.  The character of any income or loss that is recognized will depend upon a number of factors, including the status of the Creditor, the nature of the Claim in its hands, whether the Claim was purchased at a discount, whether and to what extent the Creditor has previously claimed a bad debt deduction with respect to the Claim, and the Creditor's holding period of the Claim.  This income or loss may be ordinary if the distribution is in satisfaction of accounts or notes receivable acquired in the ordinary course of the U.S. Holder's trade or business for the performance of services or for the sale of goods or merchandise.  Generally, a U.S. Holder should recognize capital gain or loss (which capital gain or loss would be long-term capital gain or loss to the extent that the U.S. Holder has held its Claim (or the asset underlying the Claim) for more than one year) if the Claim is a capital asset in the U.S. Holder's hands.  To the extent that a portion of the Cash received represents accrued but unpaid interest that the U.S. Holder has not already taken into income, the U.S. Holder should recognize ordinary interest income. See "Accrued but Unpaid Interest" below.

### (d)      Accrued but Unpaid Interest

To the extent that any amount received by a U.S. Holder of a surrendered Allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the U.S. Holder's gross income, such amount should be taxable to the U.S. Holder as ordinary interest income.  Conversely, a U.S. Holder of a surrendered Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a U.S. Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debts constituting the surrendered Allowed Claim is unclear.  Certain Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal.  Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear.  Pursuant to the Plan, distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.  However, the provisions of the Plan are not binding on the IRS or a court with respect to the appropriate tax treatment for Creditors.

### (e)     Market Discount

Under the "market discount" provisions of the Code, some or all of any gain realized by a U.S. Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its U.S. Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (ii) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition (determined as described above) of debts that it acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

### (f)     Limitation on Use of Capital Losses

U.S. Holders of Claims who recognize capital losses as a result of the distributions will be subject to limits on their use of capital losses.  For noncorporate U.S. Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (1) $3,000.00 ($1,500.00 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains.  U.S. Holders, other than corporations, may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains.  Corporate U.S. Holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

### Section 18.02     U.S. Federal Income Tax Considerations to Non-U.S. Holders of Allowed Claims

Subject to the discussion of backup withholding, below, a Non-U.S. Holder generally will not be subject to U.S. federal income tax or withholding tax on amounts received in settlement of a Claim that represent accrued but unpaid interest unless such interest income is effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States. In addition, a Non-U.S. Holder generally will not be subject to U.S. federal income tax or withholding tax on any gain realized on the settlement of a Claim, unless (i) such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States, or (ii) the Non-U.S. Holder is an individual who is present in the United States for 183 days or more during the taxable year in which the gain is realized and certain other

requirements are met, in which case, the Non-U.S. Holder may be subject to tax a 30% rate on such gain which may be offset by U.S. source capital losses.

Any income (including amounts representing accrued and unpaid interest) or gain realized by a Non-U.S. Holder that is effectively connected with the Non-U.S. Holder's U.S. trade or business generally will be taxed in the same manner as such income or gain would be taxed to a U.S. Holder. However, a Non-U.S. Holder may be exempt from U.S. taxation under an income tax treaty if the income or gain is not attributable to a permanent establishment maintained by the Non-U.S. Holder in the United States. If the Non-U.S. Holder is a foreign corporation, any effectively connected income or gain also may be subject to a 30% U.S. branch profits tax (although an applicable income tax treaty may provide for a lower rate).

**Section 18.03      Information Reporting and Backup Withholding**

Certain payments, including payments in respect of Claims pursuant to the Plan, are generally subject to information reporting to the IRS. Moreover, such reportable payments may be subject to backup withholding at a rate of 28% unless the Holder (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (ii) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules will be allowed as a refund or a credit against your U.S. federal income tax liability, if any, provided the required information is furnished to the IRS.

**THE PRECEDING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME CONSEQUENCES IS FOR GENERAL INFORMATION ONLY AND IS NOT TAX ADVICE. WE URGE EACH HOLDER OF CLAIMS OR INTERESTS TO CONSULT ITS OWN TAX ADVISOR REGARDING THE PARTICULAR FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES TO THEM OF CONSUMMATION OF THE PLAN, INCLUDING THE CONSEQUENCES OF ANY PROPOSED CHANGE IN APPLICABLE LAWS.**

## ARTICLE XIX

## CONCLUSION AND RECOMMENDATION

The Debtors believe that the Plan is in the best interests of all Holders of Claims and Interests, and urge those Holders of Claims entitled to vote to accept the Plan and to evidence such acceptance by returning their Ballots so they will be RECEIVED by the Balloting Agent no later than June 4, 2010.

*(Signature Page Immediately Follows)*

Dated: June 8, 2010

MPF HOLDING US LLC

By: _____
Name: _____Gerard Donald_____
Title: _____Authorized Signatory_____

Dated: June 8, 2010

MPF CORP. LTD

By: _____
Name: _____Richard G. Petrie_____
Title: _____CEO of MPF Corp. Ltd._____

Dated: June 8, 2010

MPF-01 LTD

By: _____
Name: _____Richard G. Petrie_____
Title: _____Authorized Signatory_____

**DEBTORS AND DEBTORS IN POSSESSION**

*[Signature Page]*