

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

**ENTERED**
**02/28/2011**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **MPF HOLDING US LLC, et al.,** | § | **Case No. 08-36084** |
| | § | **(Chapter 11)** |
| Debtors. | § | **(Jointly Administered)** |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |

## AMENDED[1] MEMORANDUM OPINION RELATING TO MOTION OF AKER PUSNES AS FOR AN ORDER ENFORCING THE TERMS OF CONFIRMATION ORDER
### [Docket Nos. 510, 514, 515, 516, 517, 519, 523, 526, & 533]

### I. INTRODUCTION

The Court issues this Memorandum Opinion to address an issue litigated with increasing frequency: how much detail must a plan contain to enable a post-confirmation trustee (or reorganized debtor) to prosecute claims against third-parties that arose prior to confirmation? Stated differently, under 11 U.S.C. § 1123b(3)(B),[2] how precise must a plan's "reservation and enforcement" provision be so that after a court confirms the plan, the litigation trustee (or reorganized debtor) will have standing to prosecute the claims that exist as of the confirmation date?

In the case at bar, counsel for numerous parties heavily negotiated the language in the confirmed plan, not the least of which was counsel for the debtors and counsel for the unsecured creditors' committee. After confirmation, the litigation trustee brought numerous suits against

---

[1] The amendments are technical amendments and do not affect the substance of the original Memorandum Opinion.

[2] Reference to any section (i.e. §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code. Any reference herein to "the Code" refers to the United States Bankruptcy Code.

multiple defendants to recover alleged preferential transfers. One of these defendants has filed a motion to enforce the confirmed plan in the main case, arguing that the plan's language forbids such suits; other defendants have filed joinders supporting this motion. Moreover, in the respective adversary proceedings initiated by the litigation trustee, some of these same defendants have filed motions to dismiss.[3] The Court held a hearing on December 17, 2010 on all of these motions, at which time parties introduced certain exhibits and engaged in oral arguments; no parties adduced testimony. The Court then issued an oral ruling on January 6, 2011, concluding that: (1) the language in the plan does not satisfy the standard established by the Fifth Circuit for reserving causes of action; (2) therefore, the litigation trustee has no standing to prosecute the suits; and (3) accordingly, this Court has no subject matter jurisdiction over these suits, and they must be dismissed.[4]

This Memorandum Opinion now memorializes this ruling, and in greater detail than the Court did during its oral ruling, on how it arrived at its decision. To the extent that this Court's oral findings of fact and conclusions of law in any way conflict with this Memorandum Opinion's written findings and conclusions, the latter shall govern. To the extent that the Court's oral findings and conclusions address issues not covered in this Memorandum Opinion, these oral findings and conclusions shall supplement the written findings and conclusions set forth herein.

---

[3] [Adv. No 10-03441, Doc. No. 4]; [Adv. No. 10-03477, Doc. No. 6].

[4] *Blue Water Endeavors, LLC v. AC & Sons, Inc. (In re Blue Water Endeavors, LLC)*, Adv. No. 10-1015, 2011 Bankr. LEXIS 67, at *15 n.14 (Bankr. E.D. Tex. Jan. 6, 2011). "When a plaintiff cannot satisfy the standing requirements imposed by Article III, courts lack subject matter jurisdiction over a case." *Id.* (citing *Bell v. Am. Traffic Solutions, Inc.*, 371 Fed. App'x 488, 489 (5th Cir. 2010)).

## II. PROCEDURAL AND FACTUAL BACKGROUND

1. On September 24, 2008, the Debtors filed their voluntary Chapter 11 bankruptcy petition. [Doc. No. 1].[5]

2. On June 14, 2010, this Court entered an Order Approving Debtors' Amended Disclosure Statement (As Modified) and Confirming Debtors' Amended Joint Plan of Reorganization (as Modified). [Doc. No. 401].

3. The Debtor's Amended Joint Plan of Reorganization (the Plan) contains certain language releasing claims and preserving claims. [Doc. No. 392].

4. The Plan allows for the appointment of a litigation trustee (the Litigation Trustee) to oversee and administer a post-confirmation litigation trust. [Doc. No. 392, p. 10]. The purpose of this trust is to liquidate claims in order to pay allowed unsecured claims pursuant to the Plan.

5. Since confirmation of the Plan, the Litigation Trustee has filed lawsuits against several defendants for preferences. [*See, e.g.*, Doc. Nos. 446, 459, 477, 485 & 521].

6. On November 8, 2010, Aker Pusnes AS (Aker), one of several preference defendants, filed its Amended Motion for an Order Enforcing the Terms of Confirmation Order (the Aker Motion). [Doc. No. 510]. The following preference defendants filed joinders to the Aker Motion: Mustang Engineering Ltd., Worldwide Oilfield Machine, Inc., KCA Deutag Drilling, Ltd., and InOcean AS (hereinafter, Aker and the other defendants who have filed joinders are collectively referred to as the Defendants). [Doc. Nos. 514, 515, 519, & 523].

7. On November 29, 2010, the Litigation Trustee filed his Objection to (I) the Aker Motion, (II) the Joinder of Mustang Engineering Ltd. to the Aker Motion, and (III) the Joinder of Worldwide Oilfield Machine, Inc. to the Aker Motion (the Objection). [Doc. No. 516]. That same day, the

---

[5] This bankruptcy case is jointly administered. The debtors in this case are MPF Corp. Ltd., MPF-01 Ltd., and MPF Holding US LLC (collectively, the Debtors).

Litigation Trustee also filed his brief in support of the Objection in both the main case and in the adversary proceeding where Aker is a defendant. [Doc. No. 517].

8.  On November 29, 2010, the Litigation Trustee also filed his (I) Response to Joinder of Mustang Engineering Ltd. to the Aker Motion and (II) Supplemental Response to the Aker Motion. [Doc. No. 518].

9. On December 7, 2010, Aker filed its Reply in Support of the Aker Motion. [Doc. No. 526]. On December 14, Mustang Engineering, Ltd. filed its Reply in Support of Joinder to the Aker Motion. [Doc. No. 527].

10. On December 17, 2010, this Court held a hearing on, among other things, the Aker Motion, at which time certain exhibits were introduced and oral arguments were made; no testimony was adduced. The Court took the matter under advisement on December 17, 2010, and permitted the parties to file additional briefing. The parties proceeded to file supplemental briefs on December 28 and 29, 2010. [Doc. Nos. 539–543].

11. On January 6, 2011, this Court issued an oral ruling and entered an Order on Motion of Aker Pusnes AS for an Order Enforcing the Terms of the Confirmation Order and Ordering Dismissal of Certain Adversary Proceedings without Prejudice (the Aker Order).

12. On January 14, 2011, the Aker Order was entered on the docket. [Doc. No. 556]. Following the entry on the docket of the Aker Order, this Court has dismissed the adversary proceedings brought by the Litigation Trustee on the grounds that this Court lacks subject matter jurisdiction to adjudicate these disputes.

### III. Conclusions of Law

#### A. Jurisdiction and Venue

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This dispute is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L) because the dispute relates to the Plan—specifically, to the interpretation and execution of the Plan. The Fifth Circuit has consistently held that a bankruptcy court has post-confirmation jurisdiction over matters "that bear on the interpretation or execution of the debtor's plan." *Bank of La. v. Craig's Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.)*, 266 F.3d 388, 390 (5th Cir. 2001); *In re U.S. Brass Corp.*, 301 F.3d 296, 304 (5th Cir. 2002); *Newby v. Enron Corp. (In re Enron Corp. Sec.)*, 535 F.3d 325, 335 (5th Cir. 2008). Additionally, this proceeding is a core proceeding under the general "catch-all" language of 28 U.S.C. § 157(b)(2). *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case.") *De Montaigu v. Ginther (In re Ginther Trusts)* Adv. No. 06-3556, 2006 WL 3805670, at *19 (Bankr. S.D. Tex. Dec. 22, 2006) (holding that an "[a]dversary [p]roceeding is a core proceeding under 28 U.S.C. § 157(b)(2) even though the laundry list of core proceedings under § 157(b)(2) does not specifically name this particular circumstance"). Finally, venue is proper pursuant to 28 U.S.C. §§ 1408 & 1409.

#### B. The Issue in the Dispute at Bar is Whether the Plan has Properly Preserved the Preference Suits that the Litigation Trustee has Brought Against the Defendants.

While the parties raised many issues at the December 17, 2010 hearing, this Court primarily focuses on one issue—namely, whether the Plan effectively preserves pre-confirmation causes of action for the Litigation Trustee to prosecute post-confirmation.

How much detail must a plan contain to enable a post-confirmation trustee (or reorganized debtor) to prosecute claims against third-parties that arose prior to confirmation? Courts have differed on how specific the reservation provision in a plan must be. *Rifken v. CapitalSource Fin., LLC (In re Felt Mfg. Co.)*, 402 B.R. 502, 516 (citing *Connolly v. City of Houston (In re W. Integrated Networks, LLC)*, 329 B.R. 334, 338 (Bankr. D. Colo. 2005)) (describing two approaches to "rights of reservations" in chapter 11); 7 Collier on Bankruptcy, P 1123.02[3][b], at 123–23 (noting disagreement over the specificity required to preserve claims). Three approaches have developed.

Some courts find that broad, categorical language is sufficient to preserve causes of action. *See, e.g.*, *P.A. Bergner & Co. v. Bank One (In re P.A. Bergner & Co.)*, 140 F.3d 1111, 1117 (7th Cir. 1998) ("[W]hile there might be some logic in requiring 'specific and unequivocal' language to preserve claims belonging to the estate . . . the statute itself contains no such requirement."); *Kmart Corp. v. Intercraft Co. (In re Kmart Corp.)*, 310 B.R. 107, 124 (Bankr. N.D. Ill. 2004) ("[A] categorical reservation can effectively avoid the *res judicata* bar."); *In re Weidel*, 208 B.R. 848, 853 (Bankr. M.D.N.C. 1997).

Other courts have taken a more middle-ground approach, based on the nuances of the plan language and the procedural history of the bankruptcy case. *See, e.g.*, *Elk Horn Coal Co., LLC v. Conveyor Mfg & Supply, Inc. (In re Pen Holdings, Inc)*, 316 B.R. 495, 504 (Bankr. M.D. Tenn. 1994) (stating that the reservation provision in a plan must be evaluated within the context of each case and in relation to the particular claims at issue).

Finally, the Fifth Circuit, and a number of other courts, have approached this question from a third direction, requiring that a reservation provision be more precise. *See, e.g.*, *Dynasty Oil & Gas, LLC v. Citizens Bank (In re United Operating, LLC)*, 540 F.3d 351, 355 (5th

Cir. 2008); *Browning v. Levy*, 283 F.3d 761, 775 (6th Cir. 2002) ("[A] general reservation of rights does not suffice to avoid res judicata."); *Retal Mktg. Co. v. Nw. Nat'l Bank (In re Mako)*, 120 B.R. 203, 209 (Bankr. E.D. Okla 1990), *quoted in Retail Mktg. Co. v. King (In re Mako, Inc.)*, 985 F.2d 1052, 1055 n.3 (10th Cir. 1993), *appeal decided*, 5 F.3d 547 (10th Cir. 1993) (table); *Harstad v. First Am. Bank*, 39 F.3d 898, 902 (8th Cir. 1994) (noting that a party that wishes to retain its power to enforce claims pursuant to § 1123(b)(3) could do so with straightforward language).

> 1. The Fifth Circuit has Held that for a Pre-Confirmation Cause of Action Held by the Estate to be Prosecuted Post-Confirmation, It Must be Specifically and Unequivocally Retained by the Plan of Reorganization.

In its watershed case of *In re United Operating, LLC,* the Fifth Circuit held that in order for a plan of reorganization to effectively preserve causes of action, the plan must "expressly retain the right to pursue such causes of action" and the retention language must be "specific and unequivocal." 540 F.3d at 355. The Fifth Circuit reiterated these requirements in *In re Nat'l Benevolent Ass'n of the Christian Church v. Weil, Gotshal & Manges, LLP (In re Nat'l Benevolent Ass'n of the Christian Church)*, 333 Fed. App'x 822, 826 (5th Cir. 2009). Indeed, in *National Benevolent*, the Fifth Circuit actually emphasized the phrase "specific and unequivocal" when holding that the particular provision of the plan in that case was ambiguous and, therefore, failed to preserve any causes of action that could have otherwise been prosecuted post-confirmation.

This heightened notice requirement for retention of causes of action serves an important purpose. "Proper notice allows creditors to determine whether a proposed plan resolves matters satisfactorily before they vote to approve it—absent specific and unequivocal retention language in the plan, creditors lack sufficient information regarding their benefits and potential liabilities

to cast an intelligent vote." *Id.* (quoting *In re Paramount Plastics, Inc.*, 172 B.R. 331, 334 (Bankr. W.D. Wash. 1994)). "In other words, *United Operating* stands for the proposition that creditors must be able to view a proposed plan and properly evaluate the creditors' benefits and potential liabilities so that they may then consider that information when they vote to approve or disapprove a plan." *Spicer v. Laguna Madre Oil & Gas, LLC (In re Tex. Wyo. Drilling, Inc.)*, 422 B.R. 612, 625 (Bankr. N.D. Tex. 2010)

    2.  The Definition of the Phrase "Specific and Unequivocal"

    In order to determine whether the Plan in the case at bar specifically and unequivocally retains the preference claims for the Litigation Trustee to prosecute, this Court must first determine what the Fifth Circuit means by "specific and unequivocal." Two recent decisions from the United States Bankruptcy Court for the Northern District of Texas have interpreted the meaning of this phrase. Both opinions characterize the phrase as a "bright-line" rule; both criticize the rule as inimical to the Code's objective to maximizing payment to creditors; and, in applying the rule, both conclude that the retention provisions for preference claims in their respective cases satisfy the requirements imposed by this test. *Moglia v. Keith (In re Manchester, Inc.)*, Adv. No. 09-3027, 2009 Bankr. LEXIS 2003, at *14 n.6 (Bankr. N.D. Tex. 2009);[6] *In re Tex. Wyo. Drilling*, 422 B.R. at 625 n.12. This Court agrees that the *United Operating* test is a "bright-line" rule; it declines to comment on the correctness of this test and, instead, will only

---

[6] The court in *Manchester* held that the retention provision for prosecuting preference causes of action under § 547 was sufficiently "specific and unequivocal" and, therefore, held that the litigation trustee had standing to prosecute such claims. However, that court also held that the retention provision for prosecuting so-called "Non-Avoidance Claims" was not sufficiently "specific and unequivocal" and, therefore, held that the litigation trustee lacked standing to bring these particular claims. *In re Manchester, Inc.*, 2009 Bankr. LEXIS 2003, at *23. Because the Litigation Trustee in the case at bar seeks to prosecute preference actions under § 547, this opinion focuses on that portion of the *Manchester* holding that concludes that the retention provision for prosecuting preference causes of action was sufficiently "specific and unequivocal."

apply it to the facts in the case at bar;[7] and, in applying the rule, this Court concludes that the retention provision in the Plan fails to satisfy the twin requirements of the rule.

i. *In re Manchester, Inc. and In re Texas Wyoming Drilling, Inc.*

*In re Manchester, Inc.* and *In re Texas Wyoming Drilling, Inc.* are two cases where judges from the United States Bankruptcy Court for the Northern District of Texas—specifically, the Honorable Barbara J. Houser and the Honorable D. Michael Lynn—concluded that the debtors in those cases sufficiently retained post-confirmation causes of actions, despite reserving these causes of action only in a very broad sense. *In re Manchester, Inc.*, 2009 Bankr. LEXIS 2003, at *13–14; *In re Tex. Wyo. Drilling* 422 B.R. at 626–27. In *Manchester*, Judge Houser had to decide whether the following provisions in the confirmed plan were sufficiently "specific and unequivocal" pursuant to *United Operating*:

> On the Effective Date, subject to the distribution of the New Parent Common Stock and the New Subsidiary Equity Interests to the Holder of Allowed Class 4 Senior Lender Secured Claims (or its designee), all property of the Estates, and any property acquired by the Debtors during the Chapter 11 Cases or the Reorganized debtors under the Plan, shall revest in the respective Reorganized Debtors [sic] pursuant to the Terms and conditions of the Plan, including, without limitation, all executory contracts and leases assumed by the Debtors pursuant to the Plan or other Court order, free and clear of all Claims, liens, charges, or other encumbrances and Interests except as provided in the Plan and the Confirmation Order; *provided, however, that all Causes of Action shall be transferred to the Litigation Trustee, as a representative of the Estates under section 1123(b)(3)(B) of the Bankruptcy Code for the benefit of Claims Holders* as set forth in the Plan.

*In re Manchester*, 2009 Bankr. LEXIS 2003, at *10–11 (emphasis in original).

The plan goes on to provide that the litigation trustee shall:

---

[7] The Litigation Trustee has already filed an appeal of this Court's ruling. Indeed, all parties have requested a direct appeal to the Fifth Circuit under 28 U.S.C. § 158(d), and this Court has recommended to the Fifth Circuit that it accept a direct appeal. If the Fifth Circuit accepts this recommendation, this Court trusts that both the Litigation Trustee and all of the appellees will address the concerns expressed by Judges Houser and Lynn in *Manchester* and *Texas Wyoming*, respectively.

have the exclusive right to prosecute and enforce any rights to payment of claims or other rights that the Debtors or the Estates may hold against any Person (including Avoidance Actions). The Litigation Trustee shall have the exclusive right to assert any Claims or Defenses that the Debtors, the Reorganized Debtors or the Estates may hold against any Person asserting any Claims and/or Interests against the Debtor, the Reorganized Debtors or the Estates except with respect to Causes of Action that are not transferred to the Litigation Trustee.

*Id.* at *11.[8]

Although the plan did not specifically identify the names of the putative defendants whom the litigation trustee would be suing, Judge Houser nevertheless concluded that the plan's language was sufficiently "specific and unequivocal" to pass muster with the Fifth Circuit's bright-line test. Judge Houser explained her decision in *Manchester* as follows:

> After reviewing these provisions of the Plan in the context of the Fifth Circuit's holding in *United Operating*, the Court concludes that the Plan specifically and unequivocally preserved the Avoidance Actions for pursuit by the Litigation Trustee as the representative of the estate under § 1123(b)(3)(B) *of the Bankruptcy Code*. While the Plan did not identify the specific individuals or entities that the Litigation Trustee intended to sue, the Fifth Circuit has not required that level of specificity. The Court [*i.e.*, Judge Houser] comes to this conclusion based upon the *United Operating* court's reliance on *In re Ice Cream Liquidation, Inc.*, as additional support for its conclusion that the plan's reservation of the right to pursue such actions must be "specific and unequivocal," describing *Ice Cream* as "holding that the plan's categorical reservation of 'preference' claims was sufficiently specific; plan need not itemize individual transfers that may be pursued as preferential." Thus, while creditors must be told in the plan of reorganization that avoidance actions will be pursued post-confirmation by the representative of the estate, the individual prospective defendants do not have to be identified in the plan.

*In re Manchester, Inc.*, 2009 Bankr. LEXIS 2003, at 13–14 (internal citations omitted).

This conclusion—that a categorical reservation of preference claims against unidentified defendants satisfies the *United Operating* test—is reiterated in *Texas Wyoming*. There, Judge Lynn left no doubt about his agreement with Judge Houser and the holding in *Ice Cream*:

---

[8] The plan in *Manchester* defines "Avoidance Actions" as "any and all Causes of Action which a trustee, the Debtors, the Estates or other appropriate party in interest may assert under sections 502, 510, 522(f), 522(h), 542, 543, 545, 547, 548, 549, 550, 551, 553 and 724(a) *of the Bankruptcy Code*." *Id.* at *12–13.

> *United Operating* requires that a plan include "specific and unequivocal" language in order for a claim belonging to the bankruptcy estate to be enforced by a reorganized debtor after confirmation of the plan. But nowhere does *United Operating* state that the specific and unequivocal language must include identification of specific claims against specific defendants. Quite the contrary, *United Operating* cites with approval *In re Ice Cream Liquidation, Inc.*, in which a categorical reservation of preference claims was considered sufficient by the court to preserve standing. The Fifth Circuit Court of Appeals thus has not required a plan to identify specific individuals or entities as prospective defendants in order to preserve the claims; rather, as appropriate, claims may be preserved by category.

*In re Tex. Wyo. Drilling, Inc.*, 422 B.R. at 626–27 (internal footnotes and citations omitted).

It is important to note that the reservation provisions in the plan which Judge Lynn analyzed were similar to those reviewed by Judge Houser. Like the plan provision in *Manchester*, the plan provision in *Texas Wyoming* expressly referenced section § 547 of the Bankruptcy Code (among other sections) and expressly set forth that after confirmation, the reorganized debtor would be allowed to bring suits against any party who had received a preferential transfer under § 547. *Id.* at 628. Thus, in both *Manchester* and *Texas Wyoming*, although the reservation provisions did not expressly set forth the names of the putative defendants to be sued, both Judge Houser and Judge Lynn held that the express reference to § 547 was sufficiently "specific and unequivocal" to preserve all causes of action to be prosecuted after confirmation to recover preferences. Stated differently, both Judge Houser and Judge Lynn held that a generic reservation to pursue preference suits after confirmation satisfies the bright-line test established by the Fifth Circuit; in their view, actually naming the putative defendants is not required. And, both Judge Houser and Judge Lynn arrived at this conclusion by emphasizing that in *United Operating*, the Fifth Circuit cites *Ice Cream*—a case which expressly holds that a generic reservation to pursue preference suits is sufficient to preserve such suits for prosecution

following confirmation.[9] Specifically, Judges Houser and Lynn relied upon the following

passage from *United Operating* to come to their conclusion:

> The reservation must be 'specific and unequivocal.' *Harstad v. First Am. Bank*,
> 39 F.3d 898, 901–02 (8th Cir. 1994); *see also In re Ice Cream Liquidation, Inc.*,
> 319 B.R. 324, 337–38 (holding that the plan's categorical reservation of
> 'preference' claims was sufficiently specific; plan need not itemize individual
> transfers that may be pursued as preferential.)

540 F.3d at 355.

This Court understands how Judges Houser and Lynn arrived at the holdings that they

did. This Court, however, disagrees with their conclusion that the Fifth Circuit, by citing *Ice*

*Cream* in the manner that it did, held that a provision generically preserving preference actions

satisfies the bright-line test. This Court concludes that the Fifth Circuit requires that the parties to

be sued after confirmation must be individually identified in the plan, and that failure to do so

necessarily means that the bright-line test is not satisfied. Moreover, under the bright-line test,

this Court concludes that even if the putative defendants are individually named in the plan, the

provision preserving the right to sue these defendants must expressly state two other points. First,

the reservation provision must set forth the legal basis for the suit—for example, § 547. Second,

it must also state that following confirmation, these defendants **will be sued**—not that that they

**may be sued** or **could be sued** or **might be sued**.[10] How this Court arrives at these conclusions

is set forth below.

---

[9] In *Ice Cream*, the Plan's reservation provision set forth that the reorganized debtor had the power "to prosecute any claims under Sections 544, 547, 548, and 550 of the Code." *Ice Cream Liquidation, Inc. v. Calip Dairies, Inc. (In re Ice Cream Liquidation, Inc.)*, 319 B.R. 324, 337 (Bankr. D. Conn. 2005). The defendant in that case argued that this language was not sufficiently specific to preserve the causes of action against it. *Id.* The *Ice Cream* court disagreed, and concluded that "the reservation of preference causes of action in the Plan was sufficiently specific." *Id.*

[10] Thus, this Court construes the bright-line test to mean that for a preference claim to be properly preserved, a retention and enforcement provision must contain the following information and language: "After confirmation, the litigation trustee (or reorganized debtor) will file suit against [specific name of putative defendant] to recover preferential transfers under § 547."

ii. *Harstad v. First American Bank*

Both Judge Houser and Judge Lynn focus on the Fifth Circuit's citation to *Ice Cream* in *United Operating* to conclude that a generic preservation of preference actions satisfies the bright-line test. However, neither Judge Houser nor Judge Lynn discuss the Fifth Circuit's citation to *Harstad*, an Eighth Circuit opinion. 39 F.3d 898. To **directly** support the proposition that a reservation of causes of action in a plan must be "clear and unequivocal," the Fifth Circuit cites not to *Ice Cream*, but to *Harstad. United Operating,* 540 F.3d at 355. In *Harstad*, the reorganized debtors filed a post-confirmation suit against a bank pursuant to § 547 for recovery of approximately $841,850.00 in alleged preferential transfers. The defendant-bank filed a motion to dismiss the suit, and the bankruptcy court held that the debtors lacked standing to pursue the preference claim. The district court affirmed this ruling, and the reorganized debtors appealed. In support of their argument that their plan preserved the right to sue the bank for preferential transfers, the reorganized debtors cited to the following provision in their confirmed plan:

> The Court will retain jurisdiction until this Plan has been fully consummated for the following purposes: . . . determination of all causes of actions [sic] between Debtors and any other party, including but not limited to any right of Debtors **to recover assets pursuant to the provisions of the Bankruptcy Code** . . . .

*Id.* at 902 (emphasis added).

The Eighth Circuit roundly rejected the debtors' argument noting that "[t]he [debtors'] argument must fail." The Eighth Circuit observed that "specific and unequivocal" retention is a higher standard that certain courts require. *Id.* (citing *Mako*, 120 B.R. at 209). Thus, the generic phrase "to recover assets pursuant to the provisions of the Bankruptcy Code"—or similar generic phrases—will not suffice to satisfy this higher standard.

Further, this Court believes that the following passage from *Harstad* is particularly instructive as to why the Eighth Circuit rejected a generic reservation provision:

> We agree with the Bank that, if the Harstads wished to retain the power to enforce this claim pursuant to § 1123(b)(3), it would have been a simple matter to do so with straightforward language (although not so easy to do without alerting their creditors and the Bankruptcy Court to the possibility of viable preference claims).

*Harstad*, 39 F.3d at 902. This language underscores the Eighth Circuit's belief that the claim reservation provision in the plan needed to alert the putative defendant—here, the bank—that after confirmation, the reorganized debtors would sue it for preferential transfers under § 547. The Eighth Circuit noted that the debtors had plenty of time prior to the confirmation of their plan to identify any preferential transfers that might have been made, and that they should have specifically disclosed these targeted transfers in their plan. *Id.* at 903. Their failure to do so meant that they had not "specifically and unequivocally" preserved the cause of action; therefore, they had no standing to sue the bank to recover preferential transfers.

The Eighth Circuit's holding leaves little doubt about what that circuit believes constitutes a "specific and unequivocal" retention of a preference action: the plan must expressly state that a suit will be brought against a specific defendant based upon a specific legal theory (such as a preference under § 547). Generic language—such as "to recover assets pursuant to the provisions of the Bankruptcy Code" or "to recover preferential transfers from anyone who might have received such transfers"—will not suffice.

Given the Eighth Circuit's express use of the phrase "specific and unequivocal," and given the Fifth Circuit's direct citation to *Harstad* in *United Operating*, this Court believes that the bright-line test requires the Plan to name the parties who will actually be sued **and** the basis upon which the suit will be brought. Generic language approved by *Ice Cream*—such as

14

categorical reservations of "preference claims" or "claims pursuant to provisions of the Bankruptcy Code" or "claims pursuant to § 547 of the Bankruptcy Code"—will not pass muster.

### iii. *In re Ice Cream Merely Supports the Holding in United Operating.*

How can this Court reconcile the Fifth Circuit's citation to *Ice Cream* given this Court's conclusion that the bright-line test is not met if the Plan contains generic preservation language? First, *Ice Cream's* holding is merely a **supporting** citation, not a **direct** citation like *Harstad.* Indeed, the *Ice Cream* citation comes after a "*see also*" signal. The Blue Book defines a "*see also*" signal as follows: "Cited authority constitutes additional source material that supports the proposition. '*See also*' is commonly used to cite an authority supporting a proposition when authorities that state or directly support the proposition already have been cited or discussed." The Bluebook: A Uniform System of Citation R. 1.2, at 54 (Columbia Law Review Ass'n et al. eds., 19th ed. 2010) Importantly, this phrase means that the holding in *Ice Cream* merely supports the Fifth Circuit's requirement that the reservation be "specific and unequivocal," not that the Fifth Circuit adopted the holding in *Ice Cream* as its own.[11] The Fifth Circuit could have easily directly cited to *Ice Cream*, but instead used it as a supporting citation after a case (*i.e.*, *Harstad*) that it quoted within the body of its opinion (rather than in a parenthetical to a citation). *United Operating, LLC*, 540 F.3d at 355.

Moreover, in *National Benevolent*, which the Fifth Circuit decided the year after it decided *United Operating*, the Fifth Circuit did not include the original citation to *Ice Cream*, but rather omitted it. *In re Nat'l Benevolent Assoc. of the Christian Church*, 333 Fed. App'x at 826.

---

[11] In *Ice Cream*, the Court held that the reservation provision was "sufficiently specific." *Ice Cream*, 329 B.R. at 337. Therefore, the Fifth Circuit's "see also" citation is appropriately used to show that the *Ice Cream* holding of "sufficiently specific" supports the Fifth Circuit's holding that one requirement of any reservation provision is that it must be "specific." That the Fifth Circuit has also held that a reservation provision must be "unequivocal" does not in any way diminish the appropriateness of the Fifth Circuit's use of the "see also" citation to *Ice Cream* to support the holding that the first prong of the bright-line test is that the reservation of the claim must be "specific."

Instead, the Fifth Circuit reiterated its holding from *United Operating* while this time emphasizing with italics the requirement that the reservation be *specific and unequivocal*. *Id.* (citing *In re United Operating, LLC*, 540 F.3d at 355). Thus, unlike Judges Houser and Lynn, this Court does not believe that the Fifth Circuit's citation to *Ice Cream* in its *United Operating* opinion provides a sound basis for holding that a generic reference to preference actions in a reservation clause is sufficient to satisfy the bright-line test. In fact, this Court believes that the holding in *Ice Cream* conflicts with the *United Operating* holding if for no other reason than the definitions of the words "specific" and "unequivocal" do not accord with the generic language allowed by *Ice Cream*.[12]

> iv. *The Holding in Ice Cream Conflicts with the Holding in United Operating.*

The holding in *Ice Cream* does not comport with the holding and rationale within *United Operating*. The Fifth Circuit held that "[t]he reservation must be 'specific and unequivocal.'" *United Operating*, 540 F.3d at 355. Black's Law Dictionary provides definitions for both the word "specific" and the word "unequivocal." Black's Law Dictionary defines "specific" as follows:

> 1. Of, relating to, or designating a particular or defined thing; explicit <specific duties>.
>
> 2. Of, or relating to a particular named thing <specific item>.
>
> 3. Conformable to special requirements <specific performance>.

Black's Law Dictionary 1406 (9th ed. 2009)

Black's Law Dictionary defines "unequivocal" as follows: "Unambiguous; clear; free from uncertainty." *Id.* at 1529.

---

[12] The test used by the court in *Ice Cream* was whether the retention provision was "sufficiently specific;" whereas the bright line test used by the Fifth Circuit requires that the provision be both "specific" and "unequivocal." There is a distinct difference between these two tests: the Fifth Circuit's test is a  more exacting one which inevitably will conflict with the lesser *Ice Cream* standard of being just "specific."

Given these definitions, the phrase "specific and unequivocal" in the *United Operating* context means that a proper reservation provision in any plan must expressly state: (1) the name of the putative defendant; (2) the basis on which the putative defendant will be sued; and (3) that the suit will definitely be filed following confirmation. Stated differently, the language must be so Shermanesque that anyone who reads the proposed plan knows that if the plan is confirmed, the putative defendant will unquestionably be sued post-confirmation under a particular legal theory or statute.[13]

The Court believes that this definition of "specific and unequivocal" is the correct definition under *United Operating* and *National Benevolent*, and comports with the Fifth Circuit's emphasis on ensuring that plans provide proper notice and information to creditors so that they can "determine whether a proposed plan resolves matters satisfactorily before they vote to approve it." *United Operating*, 540 F.3d at 355. The requirement that a reservation be unambiguous "allows creditors to determine whether a proposed plan resolves matters satisfactorily before they vote to approve it." *United Operating*, 540 F.3d at 355. Otherwise, "creditors lack sufficient information regarding their benefits and potential liabilities to cast an intelligent vote." *Id.* (quoting *Paramount*, 172 B.R. at 334). The generic and broad language *Ice Cream* allows would not provide sufficient information so that "creditors could have reviewed

---

[13] Derived from a remark made by Civil War General William Tecumseh Sherman, the word "Shermanesque" relates to whether General Sherman would allow interested parties to draft him for the presidency. When asked whether he would allow himself to be drafted, General Sherman responded: "If drafted, I will not run; if nominated, I will not accept; if elected, I will not serve." Steven E. Woodworth, Sherman 174 (2009). Just as General Sherman left no doubt about what he would do after retiring from the military, so must a reservation clause in a plan leave no doubt about what suits will be prosecuted after confirmation and who the defendants will be in those suits. To use the Eighth Circuit's language from *Harstad*, if a plan is to have an enforceable retention clause, the plan must contain "straightforward language." *Harstad*, 39 F.3d at 902.

the possible impact of future litigation on their claims and liabilities before voting to confirm the

plan." *Id.* at 356.[14]

### 3. In the Case at Bar, the Plan's Retention of Causes of Action for the Litigation Trustee Does not Satisfy the "Specific and Unequivocal" Test.

#### i. *Review of the Applicable Retention Language in the Plan*

In applying the *United Operating* and *National Benevolent Association* holdings here,

this Court must first identify the applicable retention provision in the Plan. Section 4.03 of the

Plan provides, in relevant part, that:

> **Excluding any Cause of Action released in connection with or under the Plan** or by prior order of the Court, all Causes of Action, including, but not limited to (i) any Avoidance Action **that may exist** against any party identified on Exhibits 3(b) or 3(c) of the Debtors' statements of financial affairs, which schedules are incorporated herein by reference and (ii) any Cause of Action against Wilhelm P. Blystad or Oceania AS are reserved in Liquidating MPF and shall be transferred to the Litigation Trust as of the Effective Date, to be pursued by the Litigation Trustee, as a representative of the Estates under Bankruptcy Code § 1123(b)(3)(B) for the benefit of the Holders of Allowed Class 4 Claims.
>
> . . .
>
> The Litigation Trustee shall have the right to prosecute and enforce any rights to payment of claims or other rights and Causes of Action that the Debtors, Liquidating MPF, or the Estates **may** hold against any Person (except to the extent waived, settled, or released under this Plan or by prior order of the Bankruptcy Court).

[Litigation Trustee's Ex. No. 2, p. 18] (emphasis added).

Because the retention language refers to two defined terms—*i.e.* "Causes of Action" and

"Avoidance Action"—the Court must necessarily review how the Plan defines these phrases.

The Plan defines "Causes of Action" to include:

> All actions, causes of action, liabilities, obligations, rights, suits, damages, judgments, remedies, demands, setoffs, defenses, recoupments, crossclaims, counterclaims, third-party claims, indemnity claims, contribution claims, or any other claims whatsoever, whether known or unknown, matured or unmatured,

---

[14] *See supra* note 9 to review the specific reservation provision in *Ice Cream*.

fixed or contingent, liquidated or unliquidated, disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, in connection with or related to any of the Debtors, Liquidating MPF or their respective assets, property and Estates from the beginning of time through the Effective Date, including, but not limited to causes of action under state law or other applicable law for breach of contract, promissory estoppel, quantum meruit, unjust enrichment, constructive trust, injunctive relief, foreclosure, money had and received, usurpation of corporate or business opportunity, breach of fiduciary duty, defalcation, embezzlement, tortious interference with existing contract, tortious interference with prospective business relations, conversion, breach of express warranty, breach of implied warranty, violation of intellectual property rights, fraud, statutory fraud, fraudulent transfer, torts, misrepresentation or omission, prompt payment violations, breach of good faith and fair dealing, malpractice, conspiracy, aiding and abetting, vicarious liability, respondeat superior, principal or agent liability, securities law violations, defamation, business disparagement, trespass, nuisance, negligence, negligence per se, turnover, wrongful lien filing, wrongful foreclosure, lender liability, usury, attorneys' fees, costs, interest, veil piercing, joint venture, Avoidance Actions, and any other claims or causes of action.

[Litigation Trustee's Ex. No. 2, p. 5]. Next, the Plan defines "Avoidance Actions" as "any and all actual or potential claims or Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including §§ 542, 543, 544, 545, 547, 548, 549, 550, 551, 553, and 724(a)." [Litigation Trustee's Ex. No. 2, p. 4].

Are these provisions in the Plan sufficiently "specific and unequivocal" pursuant to *United Operating* and *National Benevolent*? As can be seen from a review of Black's Law Dictionary, the definition of the word "specific" is different than the definition of the word "unequivocal." Therefore, a bifurcated analysis must be done. First, it must be determined whether the language in the Plan is sufficiently "specific"; and second, even if it is, it must be determined whether the language is sufficiently "unequivocal."

ii. *The Language in the Plan is sufficiently "Specific."*

Section 4.03 of the Plan expressly identifies the putative defendants by referencing "any party identified on Exhibits 3(b) or 3(c) of the Debtors' statements of financial affairs, which schedules are incorporated herein by reference." Exhibits 3(b) and 3(c) expressly identify the names of the putative defendants, the addresses of these individuals and entities, and the amounts that the Debtors paid to these entities within 90 days prior to the commencement of this Chapter 11 case. Therefore, the language in the retention provision is sufficiently "specific" to satisfy the first prong of the bright-line test. However, this test is a two-prong test, with the second prong being that the retention provision must be "unequivocal." The Court now turns to this issue.

iii. *The Language in the Plan is Not "Unequivocal."*

a. The Use of the Word "May" is not "Unequivocal."

Section 4.03 of the Plan states that "all causes of Action, including but not limited to, (i) any Avoidance Action **that may exist** against any party identified on Exhibits 3(b) [or 3(c)] of the Debtors' statements of financial affairs . . .shall be transferred to the Litigation Trust." [Litigation Trustee's Ex. No. 2, p. 18] (emphasis added). Here, the phrase "that may exist" creates an ambiguity as to what causes of action are reserved for the Litigation Trustee.[15] The Plan's vagueness compounds the fact that the causes of action reserved for the Litigation Trustee amount to a blanket reservation, in direct violation of *United Operating. United Operating, Inc.* 540 F.3d at 356 ("Neither the Plan's blanket reservation of 'any and all claims' arising under the Code, nor its specific reservation of other types of claims under various Code provisions are

---

[15] In *In re SI Restructuring, Inc.*, Bankruptcy Judge Leif Clark had to determine whether a reservation and enforcement clause was "specific and unequivocal." No. 04-54504, 2009 Bankr. LEXIS 4074 (Bankr. W.D. Tex. Dec. 11, 2009). Citing *National Benevolent*, Judge Clark construed the Fifth Circuit's holding in that case to mean that "[i]t is apparently sufficient [for a defendant to successfully attack a retention clause] if the language [in the clause] is ambiguous." *Id.* at *17. Judge Clark thereafter held that the reservation clause in dispute in his court was not "specific and unequivocal." *Id.* at *18.

sufficient to preserve the common-law claims Dynasty now brings."); *see also Paramount*, 172 B.R. at 335 (holding that there was no standing to pursue preference actions when the preference actions were not preserved in the plan). Thus, this language is not "unequivocal," but rather ambiguous: on the one hand Section 4.03 identifies the names of putative defendants and the basis of the putative suits (*i.e.* preferences), but on the other, the same section sets forth that these causes of action "may exist"—as opposed to "do exist and will be prosecuted." This conflicting language hinders creditors from knowing precisely what causes of action are being preserved for, and will be prosecuted by, the Litigation Trustee; and therefore, from knowing with certainty whether they will definitively be sued, and on what grounds.[16]

Additionally, Section 4.03 of the Plan sets forth that the Litigation Trustee "shall have the right to prosecute and enforce any rights to payment of claims or other rights and Causes of Actions that the Debtors, Liquidating MPF, or the Estates **may** hold." [Litigation Trustee's Ex. No. 2, p. 18]. Once again, the use of the word "may" means that it is not definitely established what claims the Litigation Trustee actually has to prosecute. Such uncertainty necessarily means that the reservation language is not "unequivocal." Therefore, this language fails to satisfy the second prong of the bright-line test.

---

[16] It is important to note that the reservation clause in the Plan identifies putative defendants by referencing schedules 3(b) and 3(c) attached to the statements of financial affairs. These schedules are the Debtors' list of entities which received payments from the Debtors during the 90 days preceding the filing of the Chapter 11 petition. Merely because an entity receives a payment within 90 days does not automatically mean that this is a preferential payment. *See* § 547(b). There are more elements to a preferential payment than mere receipt of payment within 90 days. Thus, when section 4.03 refers to "any Avoidance Action that may exist against any party identified on Exhibits 3(b) of the Debtors' statements of financial affairs," the use of the word "may" creates uncertainty as to whether the payments described on schedules 3(b) and 3(c) are really preferential transfers. That is another reason why the causes of action described in section 4.03 are not unequivocally reserved.

b. Other Language in the Plan Also Precludes the Reservation of Claims Provision from being "Unequivocal."

Aside from the ambiguity created by the word "may," as discussed immediately above, there is other language in Section 4.03 that creates uncertainty, which necessarily means that this section is not "unequivocal." The phrase "[e]xcluding any Cause of Action released in connection with or under the Plan or by prior order of the Court" creates an ambiguity within the Litigation Trustee's reservation of the causes of action. [Litigation Trustee's Ex. No. 2, p. 18]. The Plan expressly contains the representation that some causes of action owned by the Debtors or the estate would be, or could be, released upon confirmation. The mere inclusion of this phrase renders section 4.03 ambiguous. By including this language, the reservation provision becomes unclear as to whom the Litigation Trustee could and could not sue, thus preventing creditors from discerning the possible impact of future claims and liabilities before voting on the Plan.

This is so because, in the case at bar, the Defendants entered into Novation Agreements (as defined by the Plan) with the Debtors and the Buyer (as defined in the Plan). *See, e.g.*, [Litigation Trustee's Ex. No. 6]. If these novated contracts were assumed and assigned under the Plan—and there is language indicating that they were—then the Defendants, as the non-bankrupt parties to the contracts, would have received a release for any liabilities they may have had for receiving preferential transfers under § 547. Numerous courts have held that when a contract is assumed and assigned, a post-litigation trustee may not sue the non-bankrupt party to that contract to recover preferential transfers. *See, e.g.*, *In re Superior Toy & Mfg. Co.*, 78 F.3d 1169, 1175 (7th Cir. 1996) ("[T]he assumption of the leases in accordance with § 365(b) precludes the Litigation Trustee from attempting to recover those payments") (quoting *Alvarado v. Walsh (In re LCO Enterprises)*, 12 F.3d 938, 943 (9th Cir. 1993)) (internal quotation marks omitted).

The Litigation Trustee insists that the Defendants were not released from liability for preferences. However meritorious their arguments may be—and this Court does not find them compelling—the references in the Plan to "assumption and assignment" in relation to 11 U.S.C. § 365 and the novated contracts make it entirely reasonable that a creditor would construe its novation agreement as being assumed and assigned pursuant to § 365, thus acting as a complete bar to any post-confirmation preference claims against them by the Litigation Trustee.[17] Accordingly, the Court concludes that the exculpatory language cited above renders the retention provision ambiguous, which in turn leads this Court to conclude that Section 4.03 does not "unequivocally" reserve the preference claims.

> c. Explicit Release Language in the Plan and the Novation Agreements Also Precludes the Reservation of Claims Provision from being "Unequivocal."

The uncertainty in the Plan relating to the assumption and assignment of the novated contracts is not the only ambiguity within the Plan relating to the release clause in section 4.03, however. The Plan is also ambiguous as to whether the Defendants obtained an outright release of their liabilities from the Debtors. Specifically, Article XI of the Plan, entitled "Compromises and Settlements," states, in pertinent part:

> In addition to the Cosco Settlement Agreement, **each of the Novation Agreements effect a compromise or settlement among the parties thereto as particularly specified therein**. . . . Pursuant to Bankruptcy Code § 363 and Bankruptcy Rule 9019, and in consideration for the classification, distribution and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith and compromise and settlement of all Claims, Interests and controversies resolved pursuant to the Plan, including without limitation, all Claims arising prior to the Petition Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, arising out of relating to or in connection with the business or affairs of, or transactions with, the Debtors. The entry of the

---

[17] This Court is expressly not ruling on the merits as to whether the Novation Agreements acted as an assumption and assignment under § 365. All that is necessary is for this Court to conclude that an ambiguity exists as to whether the novated contracts were assumed and assigned. *See In re SI Restructuring, Inc.*, 2009 Bankr. LEXIS 4074, at *6–7.The existence of this ambiguity bars the retention language in Section 4.03 from being "unequivocal."

Confirmation Order shall constitute the Bankruptcy Court's approval of each of the compromises or settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, the Estates, Creditors and other parties in interest, and are fair, equitable and within the range of reasonableness.

[Litigation Trustee's Ex. No. 2, p. 29–30] (emphasis added).

The specific reference to the Novation Agreements in Article XI, and the release language set forth thereafter, certainly suggest that the Defendants were released from any liabilities, including liabilities for preferential payments. Moreover, the Novation Agreements themselves support the position that the Defendants had their liabilities released. Not only did the Defendants receive substantial cure claim payments under the Novation Agreements in exchange for releasing their claims against the Debtors, but certain Novation Agreements contain language that is the same or similar to the following: "As full and final settlement of all past, present and future claims between the Parties, the New Buyer shall pay to the Vendor an amount equal to GBP 1,055,912.59, which amount shall be the Cure Amount defined in Clause 1.3." [Litigation Trustee's Ex. No. 6, p. 5].[18] As such, the language in both the Plan and the Novation Agreements would lead an objective, reasonable creditor to rightfully regard the Plan as fully releasing that creditor from any liability to the Debtors—including any liability for preferential transfers.[19]

Once again, the Litigation Trustee contends that the Defendants were not released. And, once again, however meritorious his arguments may be—and the Court does not find them persuasive—it is of no moment. So long as this Court concludes that Article XI at least appears

---

[18] This specific Novation Agreement defines "Parties" as COSCO, the Debtors, and KCA Deutag, Inc. As such, the settlement provision is binding on all three parties.

[19] The Court refers to certain language in the Novation Agreements even though this specific language is not also set forth in the Plan. Whether it is appropriate to refer to documents other than the Plan in assessing whether the causes of action were specifically and unequivocally reserved arguable. However, for reasons set forth later in this opinion, this Court has chosen to review language in documents other than the Plan. *See infra* note 20.

to release the Defendants, this Court must necessarily conclude that the Plan's retention provision is not "unequivocal."[20]

In sum, the phrase "[e]xcluding any Cause of Action released in connection with or under the Plan or by prior order of the Court," plus the other cited provisions, prevent the retention of the causes of action from being "unequivocal." The lack of certainty as to who is released from liability—and who is not—renders the retention provision ambiguous.

*iv. The Language in the Disclosure Statement is not "Unequivocal."*

In *Floyd v. CIBC World Mkts., Inc.*, the Honorable Nancy F. Atlas, United States District Judge for the Southern District of Texas, held that, in determining whether a plan's retention provision is specific and unequivocal, "[courts] are to consider the disclosure statement as well as the terms of a plan of reorganization." 426 B.R. 622, 637–38 (S.D. Tex. 2009). (citing *In re Kelley*, 199 B.R. 698, 704 (B.A.P. 9th Cir. 1996 ("[I]f the debtor fails to mention the cause of action in either his schedules, *disclosure statement*, or plan, then he will be precluded from asserting it postconfirmation.") (emphasis in original)). Judge Atlas made this holding because "the Disclosure Statement is a supplement to the plan and, in combination, they accomplish the reservation of claims." *Id.* at 638–39. Although there appears to be some disagreement as to whether a court may consider a disclosure statement in determining whether a plan's retention clause is specific and unequivocal,[21] because the undersigned bankruptcy judge believes that he

---

[20] Again, this Court is not ruling on the validity of the settlement provision within the Novation Agreements, but only concludes that the settlement language in Article XI creates an ambiguity as to whether the causes of action brought by the Litigation Trustee were properly preserved—*i.e.*, whether these claims were reserved "unequivocally" in the Plan.

[21] Whether a court may take into account the disclosure statement when determining if a reservation provision is specific and unequivocal is arguable for two reasons. First, the statute itself states that "a **plan** may . . . provide for . . . (b) the retention and enforcement by the debtor, by the trustee, or by a representative of the estate." 11 U.S.C. § 1123(b)(3)(B) (emphasis added). The statute makes no mention of utilizing the disclosure statement, thus throwing into question whether the disclosure statement may be utilized. *See United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989) ("The plain meaning of legislation should be conclusive, except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters" Second,

25

is bound by a decision of the United States District Court for the Southern District of Texas, this Court will abide by this holding. *In re Depugh*, 409 B.R. 125, 141 n.5 (Bankr. S.D. Tex. 2009) (noting that "decisions by the district court are binding on the bankruptcy courts of that district") (citing *Rand Energy Co. v. Strata Directional Tech., Inc. (In re Rand Energy Co.)*, 259 B.R. 274, 276 (Bankr. N.D. Tex. 2001). *Contra Villarreal v. Showalter (In re Villareal)*, 413 B.R. 633, 641 (Bankr. S.D. Tex. 2009) (the Honorable Marvin Isgur, United States Bankruptcy Judge for the Southern District of Texas, holding that because one district judge is not bound by another judge of the same court and because bankruptcy courts operate as units of the District Court, *stare decisis* does not apply to the decisions of the district court).

The Debtors' disclosure statement contains sufficient ambiguities and contradictions so as to lead this Court to conclude that the reservation of causes of action is not "unequivocal." Certain language from section 2.09(e) of the disclosure statement reads as follows:

> As described in Section 5.03 below, the Plan preserves all of the Debtors' rights in respect of all Causes of Action and Avoidance Actions (other than Causes of Action and Avoidance Actions against any Released Party that are released under the Plan or against any other person to the extent released, waived, or settled pursuant to prior orders of the Bankruptcy Court), transfers the Debtors' rights in respect of such Causes of Action (including Avoidance Actions) to the Litigation Trustee.

[Doc No. 393, p. 12].

---

in *United Operating*, the Fifth Circuit makes no mention of utilizing a disclosure statement in determining whether a reservation is specific and unequivocal. Instead, the Fifth Circuit simply states that "[i]f Dynasty had wanted to bring a post-confirmation action for maladministration of the estate's property during the bankruptcy, it was required to state as much clearly in the **Plan**." *United Operating*, 540 F.3d at 356 (emphasis added); *Nat'l Benevolent*, 333 Fed. App'x at 825–26 (noting that in *United* Operating, "[w]e concluded that a debtor's claim can survive the reorganization as the reorganized debtor's claim 'only if the plan of reorganization expressly provides for the claim's retention and enforcement by the debtor'"); see *also Paramount*, 172 B.R. at 334 (holding that creditors made aware of an intent to pursue preferences post-confirmation by virtue of the Statement of Financial Affairs and a discussion with the committee prior to the confirmation hearing still require a specific and unequivocal retention provision in the plan as "[u]nder these circumstances, the Defendant was entitled to adequate information of what the Debtor's Plan provided *with regard to it so it could make an informed decision as to how to react to the Debtor's Plan.*") (emphasis in original) (quoting *Mickey's Enters. v. Saturday Sales (In re Mickey's Enters.)*, 165 B.R. 188, 193 (Bankr. W.D. Tex. 1994)).

The Plan, in turn, goes on to define "Released Party" as "collectively, each of the Debtors, Liquidating MPF, the Committee, DvB, the Lenders, the Purchaser, the Joint Provisional Liquidators, the Litigation Trustee and each of their respective related Persons." [Litigation Trustee's Ex. No. 2, p. 11]. While this definition may seem to clarify which parties the Plan releases from claims against them, the next section of the disclosure statement (*i.e.*, section 2.09(e)) reinforces the fact that the Plan does not give voting creditors sufficient information so that they may know whether they will—or will not—be sued.

First, the disclosure statement provides that: "[t]o date, **neither the Debtors nor other parties have identified or fully investigated any potential Avoidance Actions.**" [Doc. No. 393, p. 13] (emphasis added). This statement alone leads this Court to conclude that the Plan and the disclosure statement do not unequivocally preserve causes of action for the Litigation Trustee to recover preferences from any party. Indeed, how could the Plan put a creditor on notice as to whether the Plan is favorable or disfavorable toward it when neither the Debtors nor anyone else (such as the unsecured creditors' committee) have determined who will be sued and on what basis?

Second, the disclosure statement highlights the following language:

**IN REVIEWING THIS DISCLOSURE STATEMENT AND THE PLAN, AND IN DETERMINING WHETHER TO VOTE IN FAVOR OF OR AGAINS THE PLAN, HOLDERS OF CLAIMS AND INTERESTS (INCLUDING PARTIES THAT RECEIVED PAYMENTS FROM THE DEBTORS WITHIN NINETY (90) DAYS PRIOR TO THE PETITION DATE AND ANY PARTY IDENTIFIED ON SCHEDULE 3(b) OR 3(c) OF THE DEBTORS' STATEMENTS OF FINANCIAL AFFAIRS) SHOULD CONSIDER THAT A CAUSE OF ACTION MAY EXIST AGAINST THEM, THAT THE PLAN PRESERVES ALL CAUSES OF ACTION OTHER THAN THOSE RELEASED HEREUNDER OR BY PRIOR ORDER OF THE BANKRUPTCY COURT, AND THAT THE PLAN AUTHORIZES THE LITIGATION TRUSTEE TO PROSECUTE THE SAME**

[Doc. No. 393, p. 13]. Importantly, this paragraph shares characteristics with the reservation provision within the Plan. First, this section states that "**PARTIES . . . SHOULD CONSIDER THAT A CAUSE OF ACTION MAY EXIST AGAINST THEM.**" *Id.* The word "may" creates sufficient ambiguity that it prevents a creditor voting on the Plan from knowing whether it is favorable or disfavorable to him (her or it). Moreover, this paragraph states, unlike the previous section which used the phrase "Released Party," that the plan reserves all of the causes of action except for the causes of action that are "**RELEASED HEREUNDER OR BY PRIOR ORDER OF THE BANKRUPTCY COURT.**" *Id.* Stated differently, the bold language attempts to explain who is released. This language, however, actually creates an ambiguity as to which parties are released and which parties are not released.

In sum, for the reasons set forth above, even when taking into account the information contained in the Debtors' disclosure statement, the reservation provision does not "unequivocally" reserve post-confirmation preference claims for the Litigation Trustee.

### IV. CONCLUSION

In *Manchester*, Bankruptcy Judge Houser is critical of the bright-line test because

> [a] rule that requires more disclosure than that contained in the Plan (or its attendant disclosure statement), from this judge's perspective, is unduly rigid and, in many bankruptcy cases, completely speculative. In most bankruptcy cases, the litigation claims will not have been asserted and discovery regarding the merits of those claims will not have been undertaken. Thus, any attempt to evaluate the merits of those claims for creditors would be premature. Moreover, to delay confirmation of a plan so that prospective litigation claims can be brought pre-confirmation and then be assigned to a litigation trust would only serve to needlessly run up the cost of administering bankruptcy cases.

*In re Manchester*, 2009 Bankr. LEXIS 2003, at *20. Judge Lynn shares Judge Houser's concerns. *In re Tex. Wyo. Drilling*, 422 B.R. at 625 n.12. And, the undersigned judge certainly understands their concerns. Not only the complex Chapter 11 bankruptcy bar, but also the small

business Chapter 11 bankruptcy bar, have become accustomed over the past several years to retention provisions of the sort that were contained in the confirmed plan in *Manchester*, the confirmed plan in *Texas Wyoming*, and the confirmed Plan in the case at bar. It is accurate to state that the vast majority of Chapter 11 debtors' attorneys in this country believe that retention provisions should be broadly drafted to preserve as much post-confirmation flexibility for litigation trustees (or reorganized debtors) as possible. Indeed, they draft proposed plans with this belief firmly in mind. This approach maximizes freedom for litigation trustees (or reorganized debtors) to perform due diligence and thereafter file suits to recover assets for the benefit of creditors (typically unsecured). Moreover, the Chapter 11 bar prefers this approach because, as Judge Houser notes, debtors' attorneys do not want to delay confirmation of a plan so that prospective litigation claims can be analyzed, filed pre-confirmation, and then assigned to a litigation trust or to a reorganized debtor. Rather, the debtors' bar in this country wants to get to a confirmation hearing as quickly as possible without doing all of the discovery and initiation of suits against third parties.[22]

There may well be merit and logic to this approach. However, the Fifth Circuit, in *United Operating* and *National Benevolent*, seems to be telegraphing to the debtors' attorneys (and necessarily to creditors' committees and their lawyers) that they must devote more time prior to confirmation identifying those parties who will be sued and the basis of the suits. Plan proponents must then make "specific and unequivocal" disclosures of this information in the proposed plan prior to sending out ballots to those creditors who will be casting their votes.

---

[22] Certainly, any debtor's attorney wants to proceed to a confirmation as quickly as possible for the simple sake of obtaining finality in the restructuring of debts. A debtor's attorney also wants to obtain confirmation quickly in order to avoid the unpleasant task of having to determine and disclose whether there are causes of action that can be brought against insiders of the debtor—who are typically the same individual decision-makers of the entity who retained that attorney to prosecute the Chapter 11. Counsel for a debtor would much prefer to let a litigation trustee undertake that task. Stated differently, a debtor's attorney typically does not want to bite the individual hand that fed him a corporate chapter 11 case that generates sizeable fees for that attorney.

There is no question that Judge Houser is correct in noting that this approach necessarily delays confirmation of any plan and imposes higher administration costs on the estate. Nevertheless, the Fifth Circuit appears to be placing a premium on the need for complete disclosure as to who will definitely be sued post-confirmation and on what specific legal basis. Further, the Fifth Circuit also seems to be suggesting that it is incumbent on the debtors' bar to take the time and resources to do the investigation that the bar has heretofore come to expect of post-confirmation litigation trustees.

The Fifth Circuit's insistence on "specific and unequivocal" preservation of claims may well arise from the culture of craw-fishing that has evolved in recent years in the bankruptcy practice. *See, e.g.,* Daniel J. Bussel & Kenneth N. Klee, *Recalibrating Consent in Bankruptcy,* 8 Am. Bankr. L.J 663 (2009) (noting that many norms within the bankruptcy practice have developed that undermine the legitimacy of the process). The Fifth Circuit could well be telegraphing to the bankruptcy bar that the "now you see it, now you don't" provisions in plans are no longer acceptable: either the plan sets forth absolutely who will be sued and on what basis—or no suit will be allowed. This conclusion dovetails with the Eighth Circuit's very apt and telling observation in *Harstad*, which this Memorandum Opinion has already referenced once before:

> We agree with the Bank that, if the Harstads wished to retain the power to enforce this claim pursuant to § 1123(b)(3), it would have been a simple matter to do so with straightforward language (although not so easy to do so without alerting their creditors and the Bankruptcy Court to the possibility of viable preference claims).

*Harstad,* 39 F.3d at 902. The Eighth Circuit, like the Fifth Circuit, is informing the bar that ambiguous reservation provisions will no longer suffice. Either be straightforward in the proposed plan, or be straightjacketed after confirmation of the plan.

At least that is how the undersigned judge construes the holdings in *United Operating*, *National Benevolent*, and *Harstad*; and that is why, in the case at bar, this Court has held that the Plan fails the bright-line test and that the Litigation Trustee therefore lacks standing to prosecute the adversary proceedings that he has brought.

An order consistent with this Memorandum Opinion has already been entered on the docket in the main case.

Signed on this 28th day of February, 2011.

Jeff Bohm
United States Bankruptcy Judge